IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| DINO J. BROCCOLI,<br>203 Ashley Run<br>Voorhees, New Jersey 08043 | * <br> * |
| Plaintiff | * |
| v. | * |
| ECHOSTAR COMMUNICATIONS<br>CORPORATION<br>5701 Santa Fe Drive<br>Littleton CO 80120<br>SERVE ON:<br>David K Moskowitz<br>9601 S. Meridian Blvd.<br>Englewood, CO 80112 | *<br>*<br>*<br>* |
| and | * |
| DISH NETWORK SERVICE<br>CORPORATION<br>11 East Chase Street<br>Baltimore MD 21202<br>SERVE ON:<br>National Registered Agents, Inc. of<br>Maryland<br>11 East Chase Street<br>Baltimore, MD 21202 | *<br>*<br>*<br>*<br>* |
| and | * |
| STACIE ANDERSEN<br>7045 Troy Hill Drive, Ste. 100<br>Elkridge, Maryland 21075 | *<br>* |
| Defendants | |

*      *      *      *      *      *      *      *      *      *      *      *      *

## **COMPLAINT**

Plaintiff Dino J. Broccoli, by his undersigned counsel, sues Defendants Echostar

Communications Corporation, Dish Network Service Corporation and Stacie Andersen, and

states:

## INTRODUCTION AND PARTIES

1.  Plaintiff Dino J. Broccoli is an individual residing in New Jersey, and a former employee of Dish Network Service Corporation, a division of Echostar Communications Corporation.

2.  Defendant Echostar Communications Corporation is a corporation organized under the laws of the state of Colorado and operates in the satellite television industry.

3.  Defendant Dish Network Service Corporation is a corporation organized and existing under the laws of the state of Maryland, with a principal place of business in Elkridge Maryland. Dish Network Service Corporation is a division of Echostar Communications Corporation and operates in the satellite television industry; it formerly employed Mr. Broccoli in various technical and management positions in its Elkridge, Maryland office.

4.  Defendant Stacie Andersen ("Andersen") is Dish Network Service Corporation's Human Resources Director for the Northeast Region.  She works out of the Elkridge, Maryland office and held a position of authority during Mr. Broccoli's employment with Dish Network Service Corporation and Echostar Communications Corporation ("collectively hereinafter as "Echostar").

5.  This is an action for sexual harassment (hostile environment) under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and under Md. Ann. Code art. 49B, for retaliation under both statutes and various related state law causes of action.

## JURISDICTION AND VENUE

6.  This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and the specific grant of jurisdiction in Title VII, 42 U.S.C. § 2000e *et seq.*  This Court has jurisdiction over the non-federal question aspects of this case pursuant to its supplemental jurisdiction granted by 28 U.S.C. § 1367.

7.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and/or omissions giving rise to this claim occurred within this District.

8. Mr. Broccoli has satisfied the statutory prerequisites to proceeding with his Title VII claim in this Court, as he has timely filed a claim with the Equal Employment Opportunity Commission, left the complaint pending for the prescribed ninety-day period, and has obtained a "right to sue" letter. A copy of Mr. Broccoli's "right to sue" letter is attached hereto as Exhibit A. The EEOC determined that there was reasonable cause to believe that Echostar violated Title VII of the Civil Rights Act of 1964, as amended with respect to sexual harassment and retaliatory discharge.

## FACTS COMMON TO ALL COUNTS

9. Mr. Broccoli is a 34 year-old male who began working for Echostar in its Elkridge Maryland office in March 2000 as an Installer Technician.

10. Upon realizing Mr. Broccoli's skills and good work ethic, he was promoted in May 2000 to Lead Technician.  He was promoted again in August 2000 to Field Service Manager, and served in this position until August 2001.  At this time, Mr. Broccoli also assumed the responsibilities of acting Regional Operations Manager. In August 2001, Mr. Broccoli was promoted once again to Northeast Regional Project Manager where he assumed significant responsibilities including administration, operations, and repair and installation for the region. Mr. Broccoli's first two promotions were under Lawrence Goldman, Northeast Regional Director.  Mr. Broccoli's promotion to Northeast Regional Project Manager was under Chip Paulson, who assumed the position of Northeast Regional Director after Mr. Goldman.

11. Andersen was the Human Resources Director for the Northeast Region and at all relevant times, she was acting for herself and as a managing agent for Echostar.

12. Throughout his employment with Echostar, Mr. Broccoli was subject to unwelcome sexual harassment from Andersen, including sexual advances and other verbal and physical conduct of sexual nature.

13. Andersen was unprofessional and quite manipulative, and Mr. Broccoli felt uncomfortable being around her, especially if he had to be in a room alone with her.

14.     Andersen's harassment was severe and pervasive and it interfered with Mr. Broccoli's ability to perform his work, making him uncomfortable.

15.     At all times relevant to this complaint, Mr. Broccoli performed his job well beyond the legitimate expectation of his employer and regularly received good performance reviews. In addition to his various promotions, Mr. Broccoli was named employee of the month and received several Certificates of Appreciation for various projects and management responsibilities.

16.     Mr. Broccoli was extremely qualified for all of his positions at Echostar; Mr. Goldman even believed he was more qualified than any other individual at his location. He was dependable and accurate, and exhibited nothing less than outstanding performance. In addition, Mr. Broccoli was extremely knowledgeable about the field work he was managing, he knew both how to train and manage people, and was very dedicated to the corporation.

17.     Mr. Broccoli was terminated from his position after having performed for Echostar more than satisfactorily for over a year and a half, not because of any shortcomings on his part, but as a direct result of certain wrongful and illegal sex discrimination and sexual harassment by defendant Andersen, as retaliation for refusing sexual advances and his complaining about the same, and otherwise as described herein.

*-- Andersen's Sex Discrimination and Sexual Harassment--*

18.     Beginning in June 2000, only a few months after Mr. Broccoli started working at Echostar, Defendant Andersen expressed and otherwise acted upon inappropriate sexual comments directed towards Mr. Broccoli. Andersen told Mr. Broccoli that she wanted satellite television installed at her house, but did not want the field service manager to come to her home because she was afraid he would go through her panty drawers and find her sex toys and dildo. At this early stage, Mr. Broccoli informed Andersen that such personal and sexual comments were inappropriate and that he did not want Andersen to put him in a bad position by mentioning such things. It made him feel uncomfortable.

19.  The environment in which Mr. Broccoli was placed by Echostar continued to deteriorate. Andersen peppered her business with Mr. Broccoli with constant inappropriate and unwelcome sexual references.   Examples of Andersen's sexual harassment include:

    a. Her conversation with Mr. Broccoli about her yeast infection;

    b. At certain times, Andersen told Mr. Broccoli that she was horny;

    c. She told Mr. Broccoli that she had a dildo;

    d. Andersen would call Mr. Broccoli into her office and close her blinds;

    e. Andersen would suggestively sit on Mr. Broccoli's desk and pull up her skirt;

    f. Andersen sent e-mails asking Mr. Broccoli to marry her; and

    g. Andersen would play mind games with Mr. Broccoli by telling him how great things would be, including his job, if he would succumb to her advances.

20.  Andersen's harassment was both verbal and physical.   On more than one occasion, she exposed her body to him.  Andersen would sit on Mr. Broccoli's desk and pull up her skirt in front of him. Others at Echostar observed this behavior.  Andersen once told Mr. Broccoli that she burned her breast with a curling iron and she proceeded to show him her breast. Mr. Broccoli was shocked and offended, and asked Andersen what she was doing.  He quickly got up and walked away.

21.  Andersen would make personal comments about her relationship and sexual behavior with her boyfriend.  She would also ask Mr. Broccoli very specific questions about his girlfriend, which made him feel uncomfortable. For example, Andersen asked Mr. Broccoli whether he had sex every night with his girlfriend, whether she was "good in bed," and whether she "gave him blow jobs."  Andersen explained that her boyfriend "likes his dick sucked."   To no avail, Mr. Broccoli would tell Andersen that she was entirely inappropriate, especially in the workplace, and that such matters were private and none of her business. He made it clear that such talk was unwelcome.

22. Andersen also repeatedly asked Mr. Broccoli to do things with her. She would ask him out for drinks, to go to the movies and to come over her house. Mr. Broccoli would decline such offers and request that Andersen stop asking him to go out with her.

23. On one occasion, Mr. Broccoli went to Andersen's house (after numerous requests and substantial pressure) because she claimed that she needed him to determine where to install her satellite dish. Upon his arrival, Andersen greeted Mr. Broccoli with two wine glasses and a bottle of wine, attempting to turn his visit into a social occasion.

24. Ms. Andersen's actions were calculated to embarrass and humiliate Mr. Broccoli. She made the work environment very uncomfortable and awkward for Mr. Broccoli. As with her other actions, Ms. Andersen took these actions to oppress and harass Mr. Broccoli because of his gender.

### -- Echostar and Dish Network's Notice --

25. Early on, Mr. Broccoli made it known to Echostar that Andersen was harassing him. Sometime in June 2000, he informed a management official, Mr. Lawrence Goldman, Northeast Regional Director, that he felt uncomfortable around Andersen because of her remarks and suggestions, and that he did not want to be alone with her. He also described for Mr. Goldman some of the specific inappropriate questions Andersen would ask about him about his girlfriend.

26. Mr. Goldman informed Mr. Broccoli that he too had problems with Andersen that he had reported to Andersen's supervisor, Robert Fuches, Vice President of Human Resources, but that nothing had been done. No corrective action was taken in connection with Mr. Broccoli's complaints of Andersen's harassment.

27. Mr. Broccoli also told several of his co-workers that Andersen was always making sexual advances, which made him feel uncomfortable. Many co-workers were aware of the situation from their own observations as well.

28.     Given that nothing was being done to address the sexually hostile atmosphere that Andersen had created and was maintaining, Mr. Broccoli believed he had no choice but to make the best of it. He enjoyed his job and was committed to Echostar.

29.     In August 2001, however, Mr. Broccoli met with Tammy Fornelius, National Human Resources Director, and again, and very strongly, voiced his concerns about Andersen's harassment. The meeting was prompted, in part, by Mr. Broccoli's continuous complaints concerning the non-payment of his incentives that Andersen took away in April 2001.

*-- Retaliation --*

30.     Mr. Broccoli's displeasure with Andersen's advances and his complaints about her behavior, were not well received and inspired her to find a way to get rid of Mr. Broccoli. Andersen was sure to find a way to terminate Mr. Broccoli after his meeting with Ms. Fornelius in August 2001; Mr. Broccoli specifically informed Andersen that "it was all out on the table" and that he had told Ms. Fornelius about her harassing behavior and that it had to stop.

31.     Andersen's retaliatory behavior began in the summer of 2001. She became very uncooperative in terms of work and gave Mr. Broccoli the cold shoulder. Anderson was also instrumental in holding up Mr. Broccoli's incentive bonuses and his promotion to Regional Project Manager. To date, Mr. Broccoli has not been paid all of his incentives.

32.     In the fall of 2001, Echostar began reorganizing its corporate structure and Andersen realized that this was the perfect vehicle to get rid of Mr. Broccoli.

33.     On November 28, 2001, Mr. Broccoli was terminated. Mr. Broccoli was the only member of his regional team that was discharged. All other members of his regional team either resigned or were reassigned to other positions. Those being reassigned included one Project Manager on Mr. Broccoli's regional team, being offered the position of General Manager in Echostar's Lanham, Maryland office, and another Project Manager being sent to a New York location.

34.     General Manager and Regional Manager positions were available at the time of Mr. Broccoli's termination and he was qualified for these positions.

35.  Notwithstanding the fact that there were several positions available for Mr. Broccoli in the Northeast Region, he was not offered a new position.

36.  Mr. Broccoli's termination was devastating to him.  He had worked very hard to attain the position of Regional Project Manager.

37.  Although Andersen was not the only decision maker in discharging Mr. Broccoli, she played a significant role in the process and contributed greatly to the decision. She discussed the decision (at length) with the Human Resources Manager, and they made the decision to terminate Mr. Broccoli.  Once they received the 'rubber stamp' of approval from the Vice President, Andersen discharged Mr. Broccoli.

38.  When Mr. Broccoli asked Andersen why he had been terminated, she told him because he was stupid and did not go to college and therefore she could not recommend him for a different position.

39.  Andersen's termination of Mr. Broccoli was simply a pretext to her true purpose, which was to punish Mr. Broccoli and retaliate against him for refusing her sexual advances and complaining about her wrongful and illegal sexual harassment of, and sex discrimination against, him.

40.  Following his termination, Mr. Broccoli learned that his job position was listed on the Internet as an open position on November 21, 2001 thru December 13, 2001.

41.  Mr. Broccoli found himself on the street without a job shortly right after September 11, 2001.  Mr. Broccoli has tried to find another job.  He worked shortly at two different establishments; at the first he was promised a management position that never materialized and the second position proved just as unpromising. He has sent out numerous inquires over the Internet, but has been handicapped in his efforts by the economic climate and Echostar's untruthful representations as to the reason for his termination. Upon information and belief, Echostar has represented that Mr. Broccoli's work performance was not satisfactory and that he did not have a strong work ethic.  The satellite television industry is small and well-connected and Mr. Broccoli has been unable to secure another position in the industry due to his

termination from Echostar.  Mr. Broccoli has even applied for management positions outside of the satellite television industry, but has not been able to secure a position.

42.    The constant sexual harassment directed at Mr. Broccoli created an overwhelmingly stressful environment.  His refusal of the sexual advances and resulting termination has affected his self-esteem, confidence and he has incurred consequent compensatory damages.  He has also incurred, and will continue to incur, attorneys' fees for which Defendants are liable.

COUNT ONE
(Sexual Harassment -- Title VII)
(Echostar, Dish Network, and Andersen)

43.    The allegations of paragraphs 1-42 are incorporated by referenced as if fully set forth herein.

44.    Echostar is subject to the terms of Title VII of the Civil Rights Act of 1964, in that it is engaged in an industry affecting commerce and has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

45.    Mr. Broccoli belongs to a group protected under Title VII of the Civil Rights Act of 1964, in that he is a male.

46.    As set forth above, Mr. Broccoli was subject to unwelcome sexual harassment in the course of his employment, to wit, the constant verbal and physical conduct of a sexual nature engaged in by defendant Andersen.  This conduct was unwelcome in that Mr. Broccoli did not solicit it or incite it, and Mr. Broccoli regarded the conduct as undesirable and offensive.

47.    Defendant Andersen's sexual harassment of Mr. Broccoli was based upon his sex.  If Mr. Broccoli had not been a member of the gender against which Defendant Andersen held such a significant bias, he would not have been the object of this harassment.

732719.1

48.    Defendant Andersen's sexual harassment of Mr. Broccoli affected the terms, conditions, and privileges of his employment, in that it was sufficiently severe and pervasive so as to create a hostile and abusive working environment.

49.    At all times relevant hereto, Andersen was the agent, servant and/or employee of Echostar.  The actions complained of herein were taken within the scope of authority given by Echostar to Andersen.

50.    Moreover, Echostar either knew or reasonably should have known of the sexual harassment complained of herein, and failed or refused to take remedial action.  Mr. Broccoli complained to higher management of the subject sexual harassment, to no avail; moreover, the sexual harassment was sufficiently severe and pervasive to give rise to the inference of knowledge, or constructive knowledge, on Echostar's part.  Echostar is thus liable for defendant Andersen's actions.

51.    As a direct result of the defendants' wrongdoing, Mr. Broccoli has suffered, and will continue to suffer, considerable damages.

COUNT TWO
(Sexual Harassment - Art. 49B)
(Echostar, Dish Network and Andersen)

52.    The allegations of paragraphs 1-51 are incorporated by reference as if fully set forth herein.

53.    The allegations supporting Mr. Broccoli's federal Title VII claim also constitute sexual harassment in violation of Md. Ann. Code art. 49B.

54.    As a direct result of the defendants' wrongdoing, Mr. Broccoli has suffered, and will continue to suffer considerable damages.

## COUNT THREE
### (Retaliation - Title VII)
### (Echostar, Dish Network and Andersen)

55.     The allegations of paragraphs 1-54 are incorporated by reference as if fully set forth herein.

56.     Defendant Andersen played a significant role in hiring and firing employees of Echostar, including Mr. Broccoli

57.     At all times relevant hereto, Andersen was the agent, servant and/or employee of Echostar.  The actions complained of herein were taken within the scope of authority given by Echostar to Andersen.

58.     Defendant Andersen was aware of Mr. Broccoli's participation in activity protected under Title VII, to wit, his opposition to and complaints concerning defendant Andersen's wrongful and unlawful sex discrimination and sexual harassment.

59.     An adverse employment action was taken against Mr. Broccoli, in that he was terminated for pretextual reasons.

60.     Defendant Andersen terminated Mr. Broccoli, with the participation and encouragement of Echostar, as a result of and in retaliation for Mr. Broccoli's opposition to and complaints concerning defendant Andersen's sex discrimination and sexual harassment.

61.     As a direct result of the defendants' wrongdoing, Mr. Broccoli has suffered, and will continue to suffer, considerable damages.

## COUNT FOUR
### (Retaliation - Art. 49B)
### (Echostar, Dish Network and Andersen)

62.     The allegations of paragraphs 1-61 are incorporated by reference as if fully set forth herein.

63.     The allegations supporting Mr. Broccoli's federal Title VII retaliation claim also constitute unlawful retaliation under Md. Ann. Code art. 49B.

64.     As a direct result of the defendants' wrongdoing, Mr. Broccoli has suffered, and will continue to suffer, considerable damages.

## COUNT FIVE
### (Breach of Contract)
### (Echostar and Dish Network)

65.     The allegations of paragraphs 1-64 are incorporated by reference as if fully set forth herein.

66.     Defendants agreed to pay Mr. Broccoli certain bonus incentives in connection with his employment as a field service manager.

67.     At all relevant times, Mr. Broccoli competently performed his duties and earned these incentives as promised by Defendants.

68.     Defendants did not fully pay Mr. Broccoli his incentives in accordance with its promise for the services he rendered, and thus, breached its obligation.

69.     Mr. Broccoli has been injured by Defendants' breach in the approximate amount of $8,000.

## COUNT SIX
### (Tortious Interference With Prospective Advantage)
### (Echostar, Dish Network and Andersen)

70.     The allegations of paragraphs 1-69 are incorporated by reference as if fully set forth herein.

71.     Upon information and belief, Andersen stated to several individuals, mainly prospective employers, that Mr. Broccoli was not an exemplary employee and that he was irresponsible. As the Director of Human Resources for the Northeast division, Andersen would answer reference checks for Mr. Broccoli and at least one individual who called to confirm Mr. Broccoli's employment and performance was informed that he did not have a strong work ethic and was not eligible for re-hire.

72.     At all times relevant hereto, Andersen was the agent, servant and/or employee of Echostar. The actions complained of herein were taken within the scope of authority given by Echostar to Andersen.

73.     Defendants' communications were made intentionally, willfully and with malice. Defendants' communications were calculated to cause damage to Mr. Broccoli and his business, including his ability to secure future employment. The conduct of Defendants' was perpetrated with the intentional and improper purpose of causing damage and was without justifiable cause.

74.     As a result of Defendants' actions, Mr. Broccoli has suffered and will continue to suffer economic loss, harm to his reputation and other consequential damages.

COUNT SEVEN
(Defamation)
(Echostar, Dish Network and Andersen)

75.     The allegations of paragraphs 1-74 are incorporated by reference as if fully set forth herein.

76.     Upon information and belief, Defendants made false and defamatory statements to various individuals, including, but not limited to, Mr. Broccoli's prospective employers, about his work performance while employed by Echostar.

77.     Defendant Andersen told at least one individual that Mr. Broccoli did not have a strong work ethic, was not responsible or eligible for re-hire.

78.     At all times relevant hereto, Andersen was the agent, servant and/or employee of Echostar. The actions complained of herein were taken within the scope of authority given by Echostar to Andersen.

79.     The false and defamatory statements are defamatory per se because they tend to injure Mr. Broccoli in his profession and employment, and further in impugning him to be irresponsible.

80.     The false and defamatory statements have injured and will tend to injure Mr. Broccoli and his reputation. The statements also have had a direct, adverse financial impact on Mr. Broccoli because they have contributed to his inability to secure future employment.

81.     Defendants made the aforementioned defamatory statements knowing they were false or with a reckless disregard for their truth.   Defendants made the aforementioned defamatory statements with the intent to harm Mr. Broccoli's reputation, and for their own improper motives.

82.     Defendants communicated the defamatory statements to people who reasonably understood the statements to be defamatory.

83.     As a direct and proximate cause of the false and defamatory statements published by Defendants, the character and reputation of Mr. Broccoli has been harmed, his standing and reputation in the community impaired and he has suffered a loss of prospective income.

WHEREFORE, plaintiff Dino J. Broccoli demands judgment against the defendant:

a)      for back pay, front pay, and compensatory damages in an  amount to be proven at trial, currently estimated to be not less than $3,000,000;

b)      for punitive damages in amount sufficient to punish the defendant for the wrongdoing and deter others who may be contemplating such wrongdoing, in an amount not less than $5,000,000;

c)      for his costs and reasonable attorneys' fees pursuant to the statutory entitlements implicated in this action; and

d)      for such other and further relief as this Court deems just.

## DEMAND FOR JURY TRIAL

Plaintiff Dino J. Broccoli demands a trial by jury of all issues triable of right to a jury and raised by the pleadings in this action pursuant to Fed. R. Civ. P. 38.

Jerald J. Oppel, Trial Bar No. 00652
Ober, Kaler, Grimes & Shriver
A Professional Corporation
120 E. Baltimore Street
Baltimore, MD 21202
410-685-1120

Attorneys for Plaintiff