IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DINO J. BROCCOLI,              *

     Plaintiff,              *

v.                        *        Civil Action No. AMD 03-CV-3447

ECHOSTAR COMMUNICATIONS     *
CORP., *et al.*,
                         *

     Defendants.           *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## **<u>DEFENDANTS' MEMORANDUM OF POINTS<br>AND AUTHORITIES IN SUPPORT OF THEIR<br>MOTION FOR SUMMARY JUDGMENT</u>**

Robert R. Niccolini
Elena D. Marcuss
McGuireWoods LLP
7 St. Paul Street, Suite 1000
Baltimore, Maryland 21202
(410) 659-4454

Counsel for Defendants
EchoStar Communications Corp.,
Dish Network Service Corp., and
Stacie Andersen

# TABLE OF CONTENTS

I.    STATEMENT OF THE CASE ...................................................................................1

II.   STATEMENT OF FACTS...................................................................................2

    A.  Plaintiff's Employment with Dish Network ......................................................2

    B.  Plaintiff's Regional Promotion and Incentive Pay Issues .......................................2

    C.  Plaintiff's Termination ...................................................................4

    D.  Plaintiff's Allegations of Harassment and Invasion of Privacy..............................5

    E.  Plaintiff's Allegations of Improper Conduct following his Termination.................6

III.  STANDARDS ON SUMMARY JUDGMENT ..........................................................8

IV.   THE RECENT REOPENING OF PLAINTIFF'S BANKRUPTCY CASE
      ELIMINATES PLAINTIFF'S STANDING TO SUE................................................9

V.    DEFENDANT'S SHOULD BE GRANTED SUMMARY JUDGMENT ON
      PLAINTIFF'S RETALIATION CLAIM ....................................................................11

VI.   SUMMARY JUDGMENT IS APPROPRIATE AS TO ALL OF PLAINTIFF'S
      STATE LAW CLAIMS............................................................................18

    A.  Defendants should be Granted Summary Judgment on Plaintiff's Invasion of
        Privacy Claim.......................................................................................18

    B.  Defendants Should be Granted Summary Judgment on Plaintiff's Breach of
        Contract and Wage Payment Act Claims................................................................21

    C.  Defendants Should Be Granted Summary Judgment On Plaintiff's Tortious
        Interference with Prospective Advantage and Defamation Claims .........................22

        1.  Tortious Interference with Prospective Advantage .........................................23

        2.  Defamation............................................................................24

VII.  CONCLUSION .............................................................................24

APPENDIX OF EXHIBITS ................................................................................26

Defendants EchoStar Communications Corp. ("EchoStar"), Dish Network Service Corp. ("Dish Network"), and Stacie Andersen ("Ms. Andersen;" collectively "Defendants"), through undersigned counsel, respectfully submit this Memorandum of Points and Authorities in support of their Motion for Summary Judgment. For the reasons outlined herein, Defendants' Motion for Summary Judgment should be granted and Plaintiff's First Amended Complaint should be dismissed with prejudice as a matter of law.

## I.   <u>STATEMENT OF THE CASE</u>

On December 4, 2003, Plaintiff Dino Broccoli ("Plaintiff"), a former employee of EchoStar and Dish Network, filed his original Complaint in this matter. On April 23, 2004, Plaintiff filed his First Amended Complaint ("Complaint"). Plaintiff's Complaint alleges that he was sexually harassed by Ms. Andersen, a Human Resources representative, and retaliated against for his complaints about the harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"). The Complaint also attempts to set forth claims for Invasion of Privacy (Intrusion Upon Seclusion), Breach of Contract, Violation of the Maryland Wage Payment and Collection Law ("Wage Payment Act"), Tortious Interference with Prospective Advantage, and Defamation. Discovery has now been completed, and the record reveals that there is no legal or factual basis for Plaintiff's retaliation and state law claims. In addition, because Plaintiff has no standing to sue following the recent reopening of his 2003 bankruptcy case, all of Plaintiff's claims, including his harassment claim, cannot proceed and should be dismissed. Accordingly, summary judgment in this matter is appropriate as to all claims and should be granted in favor of Defendants.

## II.    STATEMENT OF FACTS

### A.    Plaintiff's Employment with Dish Network

Plaintiff was hired by Dish Network[1] as a satellite television installer, known as a Field Service Specialist, in March of 2000.  *(First Amended Complaint ("Complaint") ¶ 9; Answer to First Amended Complaint ("Answer") ¶ 9; Deposition of Plaintiff, attached hereto as Exhibit 2, at 105:17 – 106:6.)*  In August of 2000, Plaintiff was promoted to the position of Field Service Manager.  *(Complaint ¶ 10; Answer ¶ 10.)*  In this position, Plaintiff was responsible for overseeing a group of Field Service Specialists.  *(Plaintiff Dep. (Ex. 2) at 122:3-16.)*

Effective July 21, 2001, Plaintiff was promoted to Associate Program Manager.  *(Plaintiff Dep. (Ex. 2) at 128:1-9 and Exhibit 8 thereto.)*  In this position, Plaintiff was part of the regional project team that was designed to assist various offices within the Northeast Region when issues arose.  *(Affidavit of Steve Skalski, attached hereto as Exhibit 3, at ¶ 3; Andersen Aff. (Ex. 1) at ¶ 5.)*  Forrest ("Chip") Paulson was Plaintiff's direct supervisor.  *(Andersen Aff. (Ex. 1) at ¶ 4.)*

Throughout Plaintiff's employment, Stacie Andersen was a Human Resources representative in the Baltimore office.  *(Andersen Aff. (Ex. 1) at ¶ 3.)*  Because of her position, Plaintiff had frequent occasions to discuss company business with Ms. Andersen.  *(Plaintiff Dep. (Ex. 2) at 212:15 – 213:8 and 268:6-10.)*

### B.    Plaintiff's Regional Promotion and Incentive Pay Issues

Plaintiff's claims of breach of contract and for violation of the Wage Payment Act are both based on the fact that Plaintiff did not receive incentive payments during the period prior to

---

[1] Dish Network is a subsidiary of EchoStar.  *(Affidavit of Stacie Andersen, attached hereto as Exhibit 1, at ¶ 2.)*

his official promotion to Associate Program Manager.  *(Complaint ¶¶ 68-71 and 79; Answer to Interrogatory Nos. 13 and 27, attached hereto as Exhibit 4.)*

During that time period, Dish Network had an incentive program by which employees in certain positions could earn incentives.  Field Service Manager was one of the positions eligible for incentives, but Associate Program Manager was not.  *(Andersen Aff. (Ex. 1) at ¶ 5.)* Plaintiff's pay stubs reflect that he was paid incentives through the pay period ending May 25, 2001.  *(BROC 0001 – 00010, attached hereto as Exhibit 5.)*[2]  Plaintiff was taken off the incentive grid on May 26, 2001.  *(Deposition of Stacie Andersen, attached hereto as Exhibit 6, at 120:14 – 121:16 and Exhibit 5 thereto.)*   Plaintiff's promotion to Associate Program Manager was effective on July 21, 2001.  *(Plaintiff Dep. (Ex. 2) at 128:1-9 and Exhibit 8 thereto.)*  Plaintiff was not paid incentives during the 8 week period from May 26th to July 21st.  *(BROC 00011 – 00013 (Ex. 5).)*

After Plaintiff complained about the situation to Human Resources, Dish Network considered what it could do to address the situation.  As Plaintiff had not been acting as a Field Service Manager during this period, he was not earning or entitled to incentives.  In fact, there were other individuals who had taken over his Field Service Manager responsibilities.  *(Andersen Dep. (Ex. 6) at 119:6-9, 122:17-20, and 139:13-19; Deposition of Forrest Paulson, attached hereto as Exhibit 7, Vol. 1 at 63:2 – 64:3 and Vol. II at 27:20 – 30:21 at Exhibit 7 thereto; Deposition of Tammy Fornelius, attached hereto as Exhibit 8, at 71:17 – 72:4 and 129:1-7.)*  As a result, Dish Network decided to make Plaintiff's salary increase associated with his promotion to Associate Program Manager retroactive to the first point where he was no longer receiving incentives.

---

[2] Plaintiff in fact received some incentive payments in the following pay period.  *(BROC 00011 (Ex. 5).)*

Plaintiff was paid $937.85 in retro pay. *(Plaintiff Dep. (Ex. 2) at 286:4-9; Andersen Dep. (Ex. 6) at 124:5 – 126:7 and Exhibit 6 thereto.)* The intent was to pay him the difference between his salary as a Field Service Manager and his salary as an Associate Program Manager for the period from May 26th (the date he was no longer on the incentive grid) and July 21st (the effective date of his promotion). However, it was calculated based on 8 pay periods (two week periods) rather than 8 weeks (the actual period) by mistake, a mistake that actually resulted in a higher payment to Plaintiff. *(Andersen Aff. (Ex. 1) at ¶ 7.)*

      C.    **Plaintiff's Termination**

In about the summer of 2001, Steve Skalski became the Vice President for Field Operations of DNSC. *(Deposition of Steve Skalski, attached hereto as Exhibit 9, at 16:9-17; Skalski Aff. (Ex. 3) at ¶ 3.)* During the summer and early fall of 2001, Mr. Skalski, with the assistance of his management team, reevaluated the entire management structure of DNSC's field operations. *(Skalski Dep. (Ex. 9) at 43:8 – 44:6.)* Of particular concern were the regional project teams and project manager positions (officially titled program manager). Those individuals would travel from location to location making recommendations, but were not accountable for results and did not follow up on the implementation of their recommendations. They were thus merely applying band-aid to problems, not providing permanent solutions. Dish Network decided it would be better to ensure an appropriate level of full time management for each office, according to each office's needs, and to make that management responsible for everything at that office. *(Skalski Aff. (Ex. 3) at ¶ 3; Skalski Dep. (Ex. 9) at 49:19-20; Fornelius Dep. (Ex. 8) at 103:6-25 and 107:17 – 108:10.)*

Based upon the foregoing, Mr. Skalski and his management team decided to dissolve the regional project team positions. Mr. Skalski was responsible for the decision to terminate

Plaintiff and other members of the regional teams.  *(Fornelius Dep. (Ex. 8) at 108:8-11 and 122:19-23; Skalski Aff. (Ex. 3) at ¶ 4; Skalski Dep. (Ex. 9) at 50:21 – 51:5 and 58:22 – 59:12.)* Plaintiff's employment was terminated on November 28, 2001.  *(Plaintiff Dep. (Ex. 2) at 287:13-18.)*  He was paid through December 21, 2001, however.  *(BROC 00021 (Ex. 5).)*

There were two other individuals in similar positions as Plaintiff at that time: Vanessa Gooden, whose title was Resource Manager (P3), and Betsy Wilkinson, whose title was Program Manager (P6).  Both of their positions were eliminated along with Plaintiff's as part of the dissolution of the regional project team.  *(Andersen Aff. (Ex. 1) at ¶ 12.)*  However, Ms. Gooden voluntarily resigned on November 27, 2001 before Dish Network had the opportunity to terminate her.  *(Andersen Aff. (Ex. 1) at ¶ 13.)*  Ms. Wilkinson, who was based out of the Philadelphia office, was asked to remain with DNSC until a General Manager was hired for that office with the understanding that once a General Manager was hired her employment would be terminated.  Ms. Wilkinson was never promoted to General Manager, and after a General Manager was hired for the Philadelphia office, Ms. Wilkinson resigned.  *(Andersen Aff. (Ex. 1) at ¶ 14.)*

### D.     Plaintiff's Allegations of Harassment and Invasion of Privacy

Plaintiff claims that during his employment with Dish Network he was continually sexually harassed by Ms. Andersen.  *(Answer and Supplemental Answer to Interrogatory No. 6 (Ex. 4).)*  Defendants vehemently deny these allegations, and maintain that Plaintiff did not even raise the issue of harassment until <u>after</u> his termination.  *(Andersen Dep. (Ex. 6) at 87:8-19 and 102:3 – 106:21; Skalski Dep. (Ex. 9) at 32:15 – 33:14 and 38:1 – 39:1; Fornelius Dep. (Ex. 8) at 81:11-25, 86:20-21, 90:21-23, 93:7-25, and 157:25 – 158:4.)*  Assuming the truth of Plaintiff's

allegations solely for the purposes of summary judgment, however, Plaintiff claims the following:

> • Ms. Andersen visited Plaintiff's office daily between August 2000 and August 2001, every time closing his door, and called Plaintiff to her office between 120 and 180 times between August 2000 and November 2001, each time shutting and locking her door. *(Plaintiff Dep. (Ex. 2) at 195:12-18, 212:15 – 215:4, and 217:4-12.)* Ms. Andersen on forty different occasions sat on Plaintiff's desk with her skirt hiked up, and on 5 to 10 occasions sat on his chair with her legs spread and her skirt high enough that he could see her underwear. *(Plaintiff Dep. (Ex. 2) at 219:3-6 and 220:11-20.)*

> • Ms. Andersen asked Plaintiff out for drinks at least 120 times between August 2000 and August 2001, but that he refused each of her advances. *(Plaintiff Dep. (Ex. 2) at 198:15-17.)*

> • Ms. Andersen mentioned her sex toys and dildo to Plaintiff twice. *(Plaintiff Dep. (Ex. 2) at 177:20 – 178:9 and 236:10-21.)*

> • Ms. Andersen once told him that she had burned her breast with her curling iron and then unbuttoned her blouse, pulled away her bra and showed him her breast. *(Plaintiff Dep. (Ex. 2) at 222:17 – 226:17.)*

> • Ms. Andersen told Plaintiff she was horny 2 times a week between August 2000 and November 2001. *(Plaintiff Dep. (Ex. 2) at 235:17 – 236:9.)*

> • In one conversation, Ms. Andersen asked Plaintiff whether he liked a woman who shaves in the crotch area and whether he liked to suck toes. *(Plaintiff Dep. (Ex. 2) at 256:6 – 257:8.)*

> • Ms. Andersen would ask him personal questions such as: 2-3 times whether he had sex with his girlfriend every night; 5 times whether his girlfriend was good in bed; and twice whether his girlfriend gave him blow jobs. *(Plaintiff Dep. (Ex. 2) at 242:11 – 244:21.)*

> • Ms. Andersen called Plaintiff at home to ask him out a handful of times. *(Plaintiff Dep. (Ex. 2) at 263:19 – 264:4.)*

Plaintiff's invasion of privacy claim (Count Three) is based upon the same facts as is his sexual harassment claim. *(Answer to Interrogatory No. 26 (Ex. 4).)*

### E.    Plaintiff's Allegations of Improper Conduct Following his Termination

In Counts Six and Seven of his Complaint, Plaintiff claims that Defendants tortiously interfered with his prospective advantage and defamed him by stating to prospective employers

that Plaintiff was not an exemplary employee, was irresponsible, did not have a strong work ethic, and/or was not eligible for rehire.  *(Complaint ¶¶ 81-94.)*  The only evidence Plaintiff has to support these claims is the testimony of Dr. Grace Kim.  *(Answer to Interrogatories Nos. 14 and 16 (Ex. 4); Plaintiff Dep. (Ex. 2) at 330:12 – 333:2.)*

Dr. Kim is currently Plaintiff's girlfriend and was actually his fiancé from the end of 2000 to November 2002.  *(Deposition of Grace Kim, attached hereto as Exhibit 10, at 19:21 – 20:2 and 23:5-16.)*  Dr. Kim testified that in May 2002 she called Dish Network in order to perform a reference check.  She testified that she was concerned that Plaintiff was not getting any responses from the employment applications he had submitted, and that she was "considering" recommending him for a position with her company.  *(Kim Dep. (Ex. 10) at 34:15 – 37:19.)*  Dr. Kim testified that she called the 1-800 number and was transferred to Ms. Andersen.  *(Kim Dep. (Ex. 10) at 40:13 – 41:16.)*  Dr. Kim testified that she asked Ms. Andersen, among other things, whether Plaintiff was ethical, punctual and reliable, and that Ms. Andersen responded in the negative.  *(Kim Dep. (Ex. 10) at 48:1-20.)*  Dr. Kim testified that she did not believe any of the negative things Ms. Andersen said about Plaintiff and that she knows that Plaintiff does possess a strong work ethic, is responsible, and has leadership and management skills.  *(Kim Dep. (Ex. 10) at 39:18 – 40:8 and 56:13 – 57:4.)*  Nonetheless, she decided not to recommend him for a position with her company.  *(Kim Dep. (Ex. 10) at 57:5 – 58:2.)*  Dr. Kim testified that she wrote down what Ms. Andersen said in this conversation on a form her company uses, but that she did not save those notes.  *(Kim Dep. (Ex. 10) at 36:2-13.)*

Ms. Andersen denies that this conversation ever took place.  *(Andersen Dep. (Ex. 6) at 237:19 – 238:9.)*  Moreover, Ms. Andersen testified that the company policy is that no references are given, only verification of employment by name, date, and ending salary and title if the

company has received a signed authorization from the employee.  *(Andersen Dep. (Ex. 6) at 238:10-21.)*

## III.   STANDARDS ON SUMMARY JUDGMENT

Summary judgment is appropriate where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  To defeat a motion for summary judgment, Plaintiff must produce more than a mere scintilla of evidence: "[i]f the evidence is merely colorable, or not significantly probative, summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted). Plaintiff's unsupported speculation, conclusory statements and self serving assertions are not sufficient to defeat a motion for summary judgment.  Evans v. Technologies Applications & Service Co., 80 F.3d 954, 960 (4th Cir. 1996); Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987).  A complete failure of proof concerning an essential element of the non-moving party's case renders all other facts immaterial and entitles the moving party to summary judgment.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an important part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action."  Mackey v. Shalala, 43 F. Supp.2d 559, 564 (D. Md. 1999) (quoting Celotex, 477 U.S. at 327); see also Boarman v. Sullivan, 769 F. Supp. 904, 906 (D. Md. 1991).  As various courts have noted, a defendant "should not be required to undergo the considerable expense of preparing for and participating in a trial unless the plaintiff has produced evidence on which a jury might rely in support of the claims alleged." Leskinen v. Utz Quality Foods, Inc., 30 F. Supp. 2d 530, 532 (D. Md. 1998) (quoting E.F. Hutton Mortgage Corp. v. Equitable Bank, N.A., 678 F. Supp 567, 573 (D. Md. 1988)).

When considered in light of these standards, Plaintiff's claims clearly fail to establish the existence of any genuine issue of material fact for submission to a jury.  Defendant should therefore be granted summary judgment as a matter of law.

### IV.    THE RECENT REOPENING OF PLAINTIFF'S BANKRUPTCY CASE ELIMINATES PLAINTIFF'S STANDING TO SUE

On August 5, 2003, Plaintiff filed for bankruptcy pursuant to Chapter 7 on the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey.  *(Docket Sheet for In the matter of: Dino J. Broccoli, Case No. 03-35810/JHW, attached hereto as Exhibit 11.)*  In his Amended Schedule B, which lists all personal property of the debtor of whatever kind, Plaintiff listed under the category "Other liquidated debts owing the debtor:"

> Broccoli v. Echostar
> EEOC case pending
> Back pay may be a part of claim.

Plaintiff represented to the Bankruptcy Court in his sworn schedules that the value of this claim was only $17,425.00.  *(Amended Schedule B, attached hereto as Exhibit 12.)*

Plaintiff's Charge of Discrimination had previously been filed with the Equal Employment Opportunity Commission ("EEOC") on or about January 22, 2002.  *(EEOC Charge, attached hereto as Exhibit 13.)*  On September 9, 2003, one month after the filing of Plaintiff's bankruptcy petition, the EEOC issued a Notice of Right to Sue based on the Charge explaining that Plaintiff had the right to bring suit within 90 days.  *(Notice of Right to Sue, attached hereto as Exhibit 14.)*

On November 19, 2003, the Trustee in Plaintiff's bankruptcy case, Andrew Sklar, filed a notice of intention to abandon Plaintiff's "potential action for wrongful discharge."  *(Information for Notice of Abandonment, attached hereto as Exhibit 15.)*  Plaintiff received his discharge in bankruptcy on November 7, 2003, and his bankruptcy case was officially closed on December

12, 2003.  *(Ex. 11.)*  Less than one month after receiving his discharge and before his bankruptcy case was closed, however, Plaintiff filed the present lawsuit, seeking recovery of eight million dollars for claims which he had previously represented to the Bankruptcy Court and Trustee had a value of less than twenty thousand dollars.

On August 16, 2004, the Bankruptcy Trustee filed a motion seeking an order reopening Plaintiff's bankruptcy case, voiding the abandonment of the wrongful discharge action, and reappointing Mr. Sklar as Chapter 7 Trustee.  *(Certification of Trustee In Support of Motion to Reopen Case, Voiding Abandonment and Reappointing Andrew Sklar as Chapter 7 Trustee, attached hereto as Exhibit 16.)*  In essence, the Trustee maintained that Plaintiff had "deliberately and intentionally misrepresented the value of his potential claim in order to induce the trustee to abandon said asset."  *(Ex. 16.)*  Plaintiff filed a lengthy written opposition to the motion.  *(Plaintiff's Response, attached hereto as Exhibit 17.)*  On September 7, 2004, however, over Plaintiff's objections, the Bankruptcy Court granted the Trustee's motion and reopened Plaintiff's bankruptcy case.  *(Exhibit 11.)*

As made clear in the Statement of Facts, all of Plaintiff's claims in this matter accrued on of before May 2002.  When Plaintiff filed for Chapter 7 bankruptcy on August 5, 2003, all of his claims became the property of the bankruptcy estate, and, unless those claims were exempt or abandoned by the estate, Plaintiff has no standing to pursue them.  See Miller v. Pacific Shore Funding, 287 B.R. 47, 50-51 (D. Md. 2002).  Plaintiff's Title VII claims were initially abandoned by the trustee, but as of September 7, 2004, that abandonment has been voided.  None of Plaintiff's other claims have been abandoned.  Accordingly, Plaintiff does not have standing to pursue these claims, and the present lawsuit must be dismissed.  See Miller, 247 B.R. at 51.

10

## V.    DEFENDANTS SHOULD BE GRANTED SUMMARY JUDGMENT ON PLAINTIFF'S RETALITAION CLAIM

Plaintiff claims that he was retaliated against by Ms. Andersen in his termination because of his complaints of sexual harassment.  *(Answer to Interrogatory No. 9 (Ex. 4); Plaintiff Dep. (Ex. 2) at 290:20 – 292:9.)*  Plaintiff has not educed any cognizable evidence, however, upon which to sustain this claim.  Accordingly, summary judgment should be granted in favor of Defendants on Plaintiff's retaliation claim.

In order to establish a prima facie case of retaliation, Plaintiff must establish that: (1) he engaged in a protected activity; (2) the defendant took an adverse action against the plaintiff; and (3) a causal connection exists between the protected activity and the adverse action.  See Hill v. Lockheed Martin Logistics Management, Inc., 354 F.3d 277 (4th Cir. 2004); Yancey v. National Center on Institutions and Alternatives, 986 F. Supp. 945, 956 (D. Md. 1997); Nichols v. Harford County Board of Education, 189 F. Supp. 2d 325, 343 (D. Md. 2002).  If Plaintiff establishes a prima facie case, the burden then shifts to the Defendants to show legitimate, non-retaliatory reasons for their actions, and thereby rebut the presumption raised by the plaintiff's prima facie case.   If Defendants do so, Plaintiff "bears the ultimate burden of proving retaliation by demonstrating that the employer's proffered reason is pretextual."  Yancy, 986 F. Supp. at 956 (citing Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir. 1985)).  To do so, Plaintiff must establish not that his protected activity was "part of the reason," but that "the adverse action would not have occurred 'but for' the protected activity."  Id.  In the present matter, Plaintiff is neither able to establish a prima facie case of retaliation, nor prove that Defendants' legitimate, non-retaliatory reasons for their actions were a mere pretext for intentional retaliation.  As a result, summary judgment should be entered in favor of Defendants and against Plaintiff on his retaliation claims as a matter of law.

11

Plaintiff claims that he complained about the alleged harassment on numerous occasions. Plaintiff alleges that he complained in 2000 to Larry Goldman, then Regional Director, in the Spring of 2001 to Chip Paulson, then Regional Director, and in August 2001 to Tammy Fornelius, then Senior Human Resources Manager.   *(Complaint ¶¶ 27 and 31; Answer to Interrogatory No. 10 (Ex. 4).)*  Plaintiff claims that after his conversation with Ms. Fornelius he told Ms. Andersen that it was "all out on the table."  *(Plaintiff Dep. (Ex. 2) at 281:17 – 283:15.)*

Defendants dispute that Plaintiff ever made a complaint about Ms. Andersen.   For example, Plaintiff testified that when he met with Ms. Fornelius in August of 2000 he brought up several issues including his issues with Mr. Paulson,[3] Ms. Andersen's sexual harassment of him, and his promotion and incentive pay.  *(Plaintiff Dep. (Ex. 2) at 321:11 – 322:21 and 449:11-16.)*  Ms. Fornelius, however, testified that Plaintiff brought up the issues of his promotion and incentive pay and his concerns about Mr. Paulson, but never complained about Ms. Andersen harassing him.   Rather, Plaintiff complimented Ms. Andersen professionalism.  *(Fornelius Dep. (Ex. 8) at 55:2-13, 69:11-24, 71:17 – 72:4, 78:12 – 82:5.)*  However, for purposes of summary judgment, Defendants will assume Plaintiff did complain about Ms. Andersen.  As a result, for purposes of summary judgment, Plaintiff can establish that he engaged in protected activity and was subject to an adverse action.

Plaintiff cannot, however, establish a causal connection between his protected activity and his termination.   In order to establish a causal connection, Plaintiff must establish that Defendants took the adverse action against him "because [he] engaged in a protected activity." Nichols, 189 F. Supp. 2d at 344-45 (quoting Dowe v. Total Action Against Poverty in Roanoke

---

[3] With respect to Mr. Paulson, Plaintiff complained that Mr. Paulson used the company vehicle and gas card for personal use, that he did not provide receipts for money taken from the petty cash fund, and that he had borrowed money from employees for personal use.  *(Plaintiff Dep. (Ex. 2) at 165:15 – 169:5 and Exhibit 15 thereto; Fornelius Dep. (Ex. 8) at 78:23 – 79:6.)*

Valley, 145 F.3d 653, 657 (4th Cir. 1998)).  In the present matter, there is nothing other than Plaintiff's subjective beliefs to support this conclusion.  Similarly, Plaintiff has educed no evidence to support the conclusion that Defendant's legitimate, non-retaliatory reason for his termination, the elimination of his position, was a pretext for retaliation.

Plaintiff alleges that Ms. Andersen, and only Ms. Andersen, retaliated against him for his complaints about her sexual harassment.  *(Answer to Interrogatory No. 9; Plaintiff Dep. (Ex. 2) at 290:20 – 292:9.)*  In support of this claim, Plaintiff asserts that Ms. Andersen engaged in a pattern of retaliatory behavior.  He also asserts that Ms. Andersen "played an instrumental role" in his termination which was rubber stamped by the decision-maker.  *(Answer to Interrogatory No. 9.)*  However, the evidence does not support Plaintiff's conclusion.  To the contrary, the undisputed evidence establishes that Ms. Andersen was neither the actual decision-maker nor was principally responsible the decision.  Plaintiff's conclusory assertions to the contrary are insufficient to create a genuine dispute of material fact sufficient to defeat summary judgment.  See McCain v. Waste Management, Inc., 115 F. Supp. 2d 568, 574 (D. Md. 2000) ("Plaintiff must come forward with admissible evidence that is more than self-serving opinions or speculations."); Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 960-61 (4th Cir. 1996) ("While a Title VII plaintiff may present direct or indirect evidence to support her claim of discrimination, unsupported speculation is insufficient.").

To the contrary, the evidence clearly establishes that Mr. Skalski and his management team were responsible for the decision to dissolve the regional project team positions, and that Mr. Skalski himself was responsible for the decision to terminate Plaintiff and other members of the regional teams.  *(Fornelius Dep. (Ex. 8) at 108:8-11 and 122:19-23; Skalski Aff. (Ex. 3) at ¶ 4.)*  Ms. Andersen was simply not involved in the decision, thus negating any inference of

13

retaliatory animus.  *(Andersen Dep. (Ex. 6) at 173:20 – 174:8, 198:12-14 and 200:18 – 201:9;*

*Skalski Aff. (Ex. 3) at ¶ 4.)*

Despite the clear sworn testimony in this matter, it is anticipated that Plaintiff will assert

that Ms. Andersen was the decision-maker based on a single email.  In this email, Ms. Andersen

wrote to Mr. Skalski, copying Ms. Fornelius: "I will be releasing Dino Broccoli and Vanessa

Gooden today from EchoStar.  Please let me know if you approve."  Mr. Skalski, Ms. Fornelius,

and Ms. Andersen are all clear, however, that the purpose of this email was to confirm the timing

of the termination, not to make the termination decision itself.  *(Fornelius Dep. (Ex. 8) at 119:1*

*– 124:12 and Exhibit 4 thereto; Skalski Dep. (Ex. 9) at 57:11 – 59:12 and 61:21 – 62:7 and*

*Exhibit 1 thereto; Andersen Aff. (Ex. 1) at ¶ 14.)*  Thus, the evidence does not support Plaintiff's

assertion that Ms. Andersen was the actual decision-maker or was principally responsible for the

decision.  In the absence of such evidence, Plaintiff cannot sustain his claim.  See Hill, 354 F.3d

at 291 and 298-99 ("However, we decline to endorse a construction of the discrimination statutes

that would allow a biased subordinate who has no supervisory or disciplinary authority and who

does not make the final or formal employment decision to become a decision-maker simply

because he had a substantial influence on the ultimate decision or because he has played a role,

even a significant one, in the adverse employment decision.").

Plaintiff raises several other issues ostensibly in support of his retaliation claim.  First,

Plaintiff alleges that his position, that is the position from which he was terminated, was posted

on the internet as an open position both before and after his termination.  *(Answer to*

*Interrogatory No. 9 at pages 11-12 (Ex. 4).)*  In fact, there were no open Program Manager

positions in the Northeast Region in November 2001.  Since November 2001, no Program

Manager positions have been posted or advertised for the Northeast Region and no individual has

14

been hired for or transferred into a Program Manager position in the Northeast Region. *(Andersen Dep. (Ex. 6) at 177:1 – 178:19; Andersen Aff. (Ex. 1) at ¶ 17.)*

Second, Plaintiff claims that there were other positions available for which he was qualified. Plaintiff testified in his deposition that there was an Operations Manager position and Field Service Manager positions available in Baltimore. *(Plaintiff Dep. (Ex. 2) at 298:9-17.)* In fact, no Operations Manager or Field Service Manager positions were authorized to be filled in Baltimore in the fourth quarter of 2001. *(Andersen Aff. (Ex. 1) at ¶ 18.)*

Plaintiff claims that there were General Manager positions available and that he was qualified to be a General Manager. *(Answer to Interrogatory No. 9 at pages 11 (Ex. 4).)* At the time of Plaintiff's termination, General Manager positions were available in Philadelphia and Long Island and, soon after Plaintiff's termination, a General Manager position became available in Baltimore.[4] *(Andersen Aff. (Ex. 1) at ¶ 16.)* However, Mr. Skalski, the decision-maker, did not consider Plaintiff qualified for a General Manager position. *(Skalski Dep. (Ex. 9) at 19:23 – 23:4, 26:6-8, and 70:2-10; Skalski Aff. (Ex. 3) at ¶ 5.)* As Mr. Skalski is the only decision-maker, his is the only opinion on this subject that is relevant. See Hawkins v. Pepsico, Inc., 203 F.3d 274, 280 (4th Cir. 2000).

Plaintiff's response is that other individuals who were not qualified were promoted to General Manager. For example, Plaintiff points to Michael Wingrove who was promoted to General Manager of Lanham in October 2001. *(Andersen Dep. (Ex. 6) at 211:14-18; Andersen Aff. (Ex. 1) at ¶ 8.)* Mr. Wingrove, like Plaintiff, does not have a college degree. However, Mr.

---

[4] Robert Daniels, who was the General Manager of Baltimore, resigned effective November 30, 2001. About November 16th, Mr. Daniels submitted his resignation effective November 30th. Thereafter, he rescinded his resignation. Nonetheless, the last day he worked was November 30, 2001. Thereafter, the General Manager position for Baltimore was posted. *(Andersen Aff. (Ex. 1) at ¶ 15.)*

Wingrove does have many years of management experience both while and prior to being employed by Dish Network, experience which Plaintiff did not even come close to possessing. *(Skalski Dep. (Ex. 9) at 53:6-23; Andersen Aff. (Ex. 1) at ¶ 8.)* Mr. Paulson also testified that Plaintiff should not have received the General Manager position over Mr. Wingrove. *(Paulson Dep. (Ex. 7) Vol. I at 134:12 – 135:18.)* Plaintiff also points to Chuck Ritter who became the General Manager in Baltimore after Plaintiff's termination. Mr. Ritter, who became General Manager of Baltimore effective April 13, 2002, however, had been a manager with Dish Network since July 1996. *(Andersen Aff. (Ex. 1) at ¶ 9.)*[5] By comparison, Plaintiff did not have 5 years of relevant experience and had little more than a year of management experience. *(Plaintiff Dep. (Ex. 2) at 105:3-9 and 145:5 – 146:20 and Exhibit 11 thereto.)*[6]

Third, Plaintiff attempts to cast doubt on the reason for his termination by claiming that he was the only member of the regional team that was actually discharged. *(Answer to Interrogatory No. 9 at page 11 (Ex. 4).)* He believes that the Regional team consisted of himself, Mike Wingrove, Tamiya Fishel, Betsy Wilkinson, and Vanessa Gooden. *(Plaintiff Dep. (Ex. 2) at 292:13-20.)*[7] Plaintiff's alleged delineation of the applicable regional team, however, is simply incorrect. In November 2001, Ms. Fishel was the Administrative Assistant to the Regional Manager, and was never a project manager. *(Andersen Aff. (Ex. 1) at 11; Plaintiff Dep. (Ex. 2) at 296:3-13).* Plaintiff's attempt to use Ms. Fishel as a comparator is thus unsupportable.

---

[5] Plaintiff did not apply for this open position, even though it was posted after he was terminated and he knew that he was considered eligible for rehire. *(Plaintiff Dep. (Ex. 2) at 297:11-19, 364:5-17 and Exhibits 8 and 17 thereto.)*

[6] Plaintiff's argument on this point is based primarily on his perception that the job description for General Manager requires a 4-year college degree and 5 or more years of related experience. However, each of Dish Network's witnesses testified that what is relevant is the individual's complete background or experience; that is, the policy allows for an equivalent combination of education and experience. *(Skalski Dep. (Ex. 9) at 71:6 – 72:7; Andersen Dep. (Ex. 6) at 229:11-21; Fornelius Dep. (Ex. 8) at 146:5-22.)*

[7] Plaintiff has also made reference to Garry Harvey as being on the Regional Project Team. Mr. Harvey resigned on August 24, 2001. *(Andersen Aff. (Ex. 1) at ¶ 10.)*

As for Michael Wingrove, Mr. Wingrove had been promoted from Program Manager (P6) to General Manager for the Lanham office in October 2001, in advance of Plaintiff's termination and the dissolution of the regional teams. *(Andersen Aff. (Ex. 1) at ¶ 8.)*

Only Ms. Gooden, a Resource Manager (P3), and Betsy Wilkinson, a Program Manager (P6), were in positions comparable to Plaintiff in November 2001, just prior to being downsized. *(Andersen Aff. (Ex. 1) at ¶ 12.)* Ms. Gooden resigned on November 27, 2001. *(Andersen Aff. (Ex. 1) at ¶ 13.)* Ms. Wilkinson, who was based out of the Philadelphia office, was asked to remain with DNSC until a General Manager was hired for that office with the understanding that thereafter she would be terminated. Ms. Wilkinson was never promoted to General Manager, and, after a General Manager was hired for the Philadelphia office on February 11, 2002, Ms. Wilkinson resigned on March 13, 2002. *(Andersen Aff. (Ex. 1) at ¶ 14.)* Thus, though Ms. Wilkinson remained with Dish Network for longer than Plaintiff, she ultimately did not retain her position either.

Ultimately, Plaintiff has simply failed to produce evidence from which a fact finder could conclude that he would not have been terminated "but for" his complaints. In fact, Plaintiff does not even believe that. Mr. Goldman testified that Plaintiff told him that Mr. Paulson was taking action against him for making complaints not of harassment by Ms. Andersen, but about Mr. Paulson's misuse of company property. *(Deposition of Larry Goldman, attached hereto as Exhibit 18, at 138:17 – 139:24.)* Mr. Paulson himself admitted under oath that he retaliated against Plaintiff for such complaints. *(Paulson Dep. (Ex. 1) at 139:16-21 and 147:13 – 148:2.)* Under such circumstances, proof of "but for" causation essentially becomes an impossibility as a matter of law.

The only "evidence" that Plaintiff seems to possess to support his retaliation claim is thus the mere temporal proximity between his alleged complaints and his termination.  The Fourth Circuit, however, has held that temporal proximity alone is insufficient to rest a claim of retaliation.  Yancey, 986 F. Supp. at 956; Wagner v.Wheeler, 13 F.3d 86, 91 (4th Cir. 1993) (noting that "temporal proximity… is simply too slender a reed on which to rest a … [retaliation] claim.")  See also Gibson v. Old Town Trolley Tours, 160 F.3d 177, 182 (4th Cir. 1988) (citation and quotation omitted) ("[a] jury may… not be allowed to infer [retaliation] from evidence that does no more than suggest it as a possibility"); Chappell v. School Board of the City of Virginia Beach, 12 F. Supp. 2d 509, 517 (E.D. Va. 1998) (noting that the mere fact that a plaintiff makes a complaint about an issue "does not, in and of itself, create a reasonable inference that everything that happened after that point, which the Plaintiff did not like, was caused by the fact that he had filed his complaint").  As a result, Plaintiff's claim of retaliation should be summarily dismissed.

## VI.   SUMMARY JUDGMENT IS APPROPRIATE AS TO ALL OF PLAINTIFF'S STATE LAW CLAIMS

### A.   Defendant Should Be Granted Summary Judgment on Plaintiff's Invasion of Privacy Claim.

Plaintiff's invasion of privacy claim is predicated on the exact same allegations upon which he rests his sexual harassment claim.  *(See Subsection II.D supra.)*  Maryland Courts have recognized the tort of invasion of privacy as set forth in the Restatement (Second) of Torts. Thus, in order to prove a claim of invasion of privacy, intrusion upon seclusion, Plaintiff must prove the intentional intrusion upon the solitude, seclusion, or private affairs or concerns in a manner that would be highly offensive to a reasonable person.  See Marrs v. Marriott Corp., 830

F. Supp. 274, 283 (D. Md. 1992) (citing Pemberton v. Bethlehem Steel Corp., 66 Md. App. 133, 163 (Ct. Spec. App. 1986)).

No decisions in Maryland have been located which directly address whether Maryland recognizes the tort of invasion of privacy predicated upon allegations of sexual harassment in the workplace. See generally Stanley Mazaroff and Todd Horn, Maryland Employment Law § 5.04[2][a] (2nd ed. 2003). Plaintiff is thus asking this Court to extend and expand the tort of invasion of privacy beyond the parameters of existing Maryland law. Case law in general, however, strongly suggests that the Maryland Court of Appeals would not extend the tort of invasion of privacy under these circumstances. To the contrary, were the tort of invasion of privacy be found to lie based solely upon allegations of sexual harassment, such a finding would seriously undercut the careful balance struck by the legislature in enacting prohibitions on workplace discrimination.

This Court has in the past specifically refused to recognize torts under factual circumstances that make them completely duplicative of Title VII and Article 49B of the Maryland Code. Thus, where a negligent hiring, retention or supervision claim arose out of allegations of sexual harassment, the Court has dismissed those claims as duplicative. See Perry v. FTData, Inc., 198 F. Supp. 2d 699, 707-08 (D. Md. 2002); Maxey v. M.H.M. Inc., 828 F. Supp. 376, 378 (D. Md. 1993). The rational of the Court in those cases is that the reasonableness of the conduct at issue "is not a floating concept but is itself rooted in public policy." Maxey, 828 F. Supp. at 378. Thus, "[i]n the context of hostile environment sexual harassment, the source of the public policy [is] the statutory framework provided by Title VII and its state law counterparts." Perry, 198 F. Supp. at 708. Similarly, the harassing conduct alleged herein is

only wrongful to the extent it violates the prohibition of harassment in the workplace found in Article 49B and Title VII.

Recognizing the tort of invasion of privacy in these circumstances would also allow a plaintiff to circumvent the limitation on the types and amounts of damages and from whom damages can be recovered embodied in Title VII and Art. 49B.  Thus, it would allow a plaintiff to seek damages from an individual rather than solely from the employer.  As demonstrated earlier in this case, the remedial schemes of both Title VII and 49B do no allow for such recovery.  See Arbabi v. Fred Meyers, Inc., 205 F. Supp. 2d 462, 464 (D. Md. 2002); Carson v. Giant Food, Inc., 187 F. Supp. 2d 462, 481 (D. Md. 2002).  A plaintiff would also be able to avoid the limitations on damages provided by these statutes.

The Maryland Court of Appeals has cautioned against the creation of a new substantive liability by a Court, particularly where the legislature has established a remedial scheme to address the alleged wrong.  Thus, in Makovi v. The Sherwin-Williams Co., 316 Md. 603 (1989), the Court of Appeals declined to recognize a wrongful discharge claim where the discharge was allegedly motivated by discrimination in violation of Title VII and Article 49B.  The Court concluded: "allowing full tort damages to be claimed in the name of vindicating the statutory public policy goals upsets the balance between right and remedy struck by the Legislature in establish the very policy relied upon."  Makovi, 316 Md. 626.

Based upon the foregoing, this Court should decline Plaintiff's demand to radically expand Maryland law, and should grant Defendants summary judgment on Plaintiff's claim of invasion of privacy.

**B.**      **Defendant Should Be Granted Summary Judgment on Plaintiff's Breach of Contract and Wage Payment Act Claims.**

As detailed in subsection III.B above, Plaintiff's claims for breach of contract and violation of the Wage Payment Act are both based on the fact that he did not receive incentive payments during the period prior to his official promotion to Associate Program Manager.  Both of these claims fail as a matter of law.

Maryland's Wage Payment Act controls the method and timings of the payment of wages by employers to employees.  The Act defines wages as "compensation that is due to an employee for employment," specifically including bonuses, commissions, fringe benefits, and other remuneration promised from service.  Md. Code Ann., Lab. and Emp. § 3-501(c).  Defendants do not contest that the incentives at issue, if due, would be considered wages under the Act.  However, no incentives were due to Plaintiff because he was not performing the duties of a Field Service Manager.  As explained by the Maryland Court of Appeals in Medex v. McCabe, "an employee's right to compensation vests when the employee does everything required to earn the wages."  372 Md. 28, 41 (2002).  Here, Plaintiff was not doing what was required to earn the incentives, namely, overseeing the work of a team of installers.  To the contrary, other employees were performing that work, and were in fact paid incentive pay for such work.  Accordingly, Plaintiff in not due the incentives under the Wage Payment Act.

Similar analysis controls Plaintiff's breach of contract claim.  See, e.g., Rhoads v. FDIC, 956 F. Supp. 1239, 1259-60 (D. Md. 1997).  Defendants could not have breached a contract with Plaintiff for the payment of incentives because there is no evidence that Plaintiff was promised incentives when he was no longer performing the functions of a Field Service Manager.

Plaintiff's inability to support these claims is underscored by the fact that Plaintiff cannot identify with any specificity how much he believes he is due.  Plaintiff asserts that he is due

21

approximately $8000 in incentives for this period.  *(Complaint ¶ 79; Answer to Interrogatory No. 27 (Ex. 4).)*  When Plaintiff was terminated, however, he claimed only that he was owed "over $6000" in incentives.  *(Plaintiff Dep. (Ex. 2) at 326:7-15 and Exhibit 8 thereto.)*  When asked to explain how he calculated these figures, Plaintiff testified that: "it was easy at the time because [he] had copies of what [his] technicians had done and what [his] bonuses would have been on that basis."  *(Plaintiff Dep. (Ex. 2) at 327:4-9.)*  Plaintiff, however, no longer has these documents and could not explain how the figure was calculated.  *(Plaintiff Dep. (Ex. 2) at 327:10 – 329:9.)*  In Interrogatory Answers served subsequent to Plaintiff's deposition, Plaintiff explained that he calculates this amount by multiplying the incentives he was paid for the pay period ending April 13, 2001[8] by 8.  *(Answer to Interrogatory No. 27.)*  This calculation ignores two important facts.  First, the period at issue (May 26th to July 21st) is 8 weeks (or 4 pay periods), not 8 pay periods.  Second, Plaintiff earned $5972.92 in incentives for the entire years prior to May 26, 2001 *(BROC 00010)* and had earned $1742.70 in incentives in the 4 pay periods prior to May 26, 2001.  *(BROC 0007-10.)*

Thus, as Plaintiff is not even sure what amount he would have earned had he still been performing the job of Field Service Manager, much less able to prove that he in fact performed such work, his claims must be summarily dismissed.

**C.**     **Defendant Should Be Granted Summary Judgment On Plaintiff's Tortious Interference with Prospective Advantage and Defamation Claims.**

As discussed in subsection II.F above, Plaintiff's defamation and tortious interference with prospective advantage claims are based entirely on Dr. Kim's testimony that when she

---

[8] Interestingly, Plaintiff was paid significantly more in incentives in that pay period than in any other pay period during his entire employment.  *(Ex. 5.)*

called to perform a reference check she was told that Plaintiff was not ethical, punctual and reliable. Such testimony is woefully insufficient to give rise to any cognizable claim.

### 1.   **Tortious Interference with Prospective Advantage**

The elements of a claim of tortuous interference with prospective advantage are:

(1) intentional and wilful acts;
(2) calculated to cause damage to the plaintiffs in their lawful business;
(3) done with the unlawful purpose to cause such damage and loss, without right or
     justifiable cause on the part of the defendants (which constitutes malice); and
(4) actual damage and loss resulting.

See Bagwell v. Peninsula Regional Medical Center, 105 Md. App. 470, 504 (Ct. Sp. App. 1995).

As explained in K & K Management, tortious interference "arises only out of the relationship between three parties, the parties to a contract or other economic relationship [] and the interferer []." K & K Management, Inc. v. Lee, 316 Md. 137, 154 (Md. 1989). Plaintiff's tortious inference claim fails because the requisite relationships do not exist. In this case, while Ms. Andersen is clearly the alleged interferer, Dr. Kim and Plaintiff were not parties or potential parties to a contract or even a potential contract because Plaintiff was not seeking employment with Dr. Kim. *(Plaintiff Dep. (Ex. 2) at 332:6-17.)*

For similar reasons, Plaintiff cannot establish that he suffered any actual damage or loss as a result of the Ms. Andersen's alleged statements. The only person to whom such alleged statements were made was not his potential employer but his fiancée, an individual who, by her own admission, did not believe those statements anyway. Thus, no actual damage occurred, and Plaintiff's tortious interference claim therefore fails.

Plaintiff claim fails even if it is assumed that Dr. Kim is considered a potential employer of Plaintiff. In order to be actionable, the conduct must be done "without right or justifiable cause on the part of the defendant." Bagwell, 105 Md. App. at 504 (quoting Alexander &

23

<u>Alexander, Inc. v. B. Dixon Evander & Assocs., Inc.</u>, 336 Md. 635, 652 (1994)).  This is not the case here.  First, Dr. Kim requested the information allegedly provided.  <u>Bagwell</u>, 106 Md. App. at 505; <u>Gohari v. Darvish</u>, 363 Md. 42, 60 (2001).  Second, Ms. Andersen's alleged statements were privileged both at common law and by statute.  <u>Gohari v. Darvish</u>, 363 Md. 42, 56 (Md. 2001); Md. Code. Ann., Cts. & Jud. Proc. § 5-423.  As the Court of Special Appeals wrote in <u>Bagwell</u>: "[Plaintiff] has presented no authority in support of his claim that giving an unfavorable character reference to a prospective employer, which contains or is based on false or inaccurate information, constitutes intentional interference with prospective employment relationships." 106 Md. App. at 507.  Plaintiff's claim thus fails as a matter of law.

### 2. <u>Defamation</u>

Plaintiff's defamation claim is barred by the statute of limitations.  In Maryland, actions for defamation are subject to a one year statute of limitations.  <u>See</u> Md. Code. Ann., Cts. & Jud. Proc. § 5-105.  The alleged defamatory statements at issue occurred in May 2002.  However, the Complaint was not filed until December 2003.  Accordingly, the allegedly defamatory statement did not occur within the limitations period and is therefore barred.

### VI. <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion for Summary Judgment should be granted in its entirety and judgment should be entered in favor of Defendants and against Plaintiff as a matter of law.

Respectfully submitted,


_____/s/_____
Robert R. Niccolini (Bar No. 24873)


_____/s/_____
Elena D. Marcuss (Bar No. 25547)
McGuireWoods LLP
Seven St. Paul Street, Suite 1000
Baltimore, Maryland  21202
(410) 659-4400

Attorneys for Defendants
EchoStar Communications Corp.,
Dish Network Service Corp., and
Stacie Andersen

25

**APPENDIX OF EXHIBITS**

| Ex. No. | Description |
|---|---|
| 1 | Affidavit of Stacie Andersen |
| 2 | Select portions of the Deposition of Dino Broccoli – Volumes I and II |
| 3 | Affidavit of Steve Skalski |
| 4 | Plaintiff's Answers to Defendant Dish Network Service Corporation's First Set of Interrogatories; Supplemental Answers to Defendant's Interrogatories by Plaintiff Dino J. Broccoli; Plaintiff Dino Broccoli's Answers to Defendant Dish Network Service Corporation's Second Set of Interrogatories |
| 5 | Pay Stubs Produced by Plaintiff |
| 6 | Select portions of the Deposition of Stacie Andersen |
| 7 | Select portions of the Deposition of Forrest Paulson – Volumes I and II |
| 8 | Select portions of the Deposition of Tammy Fornelius |
| 9 | Select portions of the Deposition of Steve Skalski |
| 10 | Select portions of the Deposition of Grace Kim |
| 11 | Docket Sheet for In the Matter of: Dino J. Broccoli |
| 12 | Amended Schedule B |
| 13 | EEOC Charge |
| 14 | Notice of Right to Sue |
| 15 | Information for Notice of Abandonment |
| 16 | Certification of Trustee In Support of Motion to Reopen Case, Voiding Abandonment and Reappointing Andrew Sklar as Chapter 7 Trustee |
| 17 | Plaintiff's Response to the Motion to Reopen Case |
| 18 | Select portions of the Deposition of Larry Goldman |

\\LAB\515214