IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DINO BROCCOLI, et al.,       :
     Plaintiffs         :
                           :
     v.                    :         Civil No. AMD 03-3447
                           :
ECHOSTAR COMMUNICATIONS   :
CORPORATION, et al.,       :
     Defendants        :

...o0o...

MEMORANDUM OPINION

This employment discrimination case was tried before a jury beginning on March 14, 2005, and on March 30, 2005, judgment was entered on the jury's verdict in the amount of $9668.64 in favor of plaintiff, Dino Broccoli ("Broccoli"),[1] on claims for breach of contract and violation of the Maryland Wage Payment and Collection Act ("wage payment claim"), MD. CODE ANN., LAB. & EMPL. §§ 3-501, *et seq*. At the same time, judgment was entered in favor of defendants Echostar Communications Corporation and Dish Network Corporation (collectively referred to as "Echostar") as to claims for sexual harassment and retaliation asserted pursuant to Title VII of the Civil Rights Act of 1964. Finally, judgment was entered in favor of Echostar and defendant Stacie Andersen ("Andersen") as to the state law claim for tortious interference with prospective economic advantage.

Broccoli has filed a motion for an award of attorney's fees in respect to the wage payment claim as authorized by state law. *See* MD. CODE ANN., LAB. & EMPL. § 3-507.1

---

[1]Andrew Sklar, the trustee handling Broccoli's bankruptcy, intervened as an additional plaintiff and authorized Broccoli's counsel to protect the interests of the bankruptcy estate, but he took no active part in the litigation.

(authorizing an award of reasonable counsel fees and costs if an employer is found to have

withheld wages in violation of section 3-507.1 and not as a result of a bona fide dispute).

Also, Echostar has filed a bill of costs based on its assertion that it is a "prevailing party"

under Fed.R.Civ.P. 54(d)(1)("[C]osts other than attorney's fees shall be allowed as a matter

of course to the prevailing party unless the court otherwise directs."), to which Broccoli has

timely objected.  In this Memorandum Opinion, the court shall rule on these two matters. In

addition, the court shall articulate its reasoning for its earlier order granting in part Broccoli's

motion for sanctions and shall, concomitantly, determine the amount of fees and costs to be

awarded to plaintiff pursuant to Fed.R.Civ.P. 37.

## I.

## A.

Plaintiff's principal claims in this case were based on allegations of sexual harassment

and retaliation under Title VII. Several state law claims also survived summary judgment.

In sum, plaintiff alleged that a Baltimore-based human resources administrator for Echostar,

defendant Andersen, engaged in a series of inappropriate, sexually-charged behaviors, and

related questioning and badgering of him, in the course of his employment, thereby creating

a hostile work environment, and that, in retaliation for his rebuffs to her, Andersen

orchestrated the termination of his employment under the guise of an organizational

realignment and reduction in force. Furthermore, even after his termination, plaintiff

asserted, Andersen provided false and defamatory employment references to his would-be

employers, thus burdening his efforts to obtain employment, and thereby further violating

Title VII's anti-retaliation and non-discrimination proscriptions. Echostar and Andersen denied all of plaintiff's allegations and mounted a determined and vigorous defense to all of plaintiff's claims.

During discovery, on September 9, 2004, Broccoli filed a motion for sanctions against Echostar, alleging that Echostar had culpably failed to preserve critical records and documents relevant to several claims and defenses in the case and was guilty of spoliation of evidence.[2]  On January 8, 2005, in ruling on the motion for sanctions, the court issued an order granting the motion in part, noting that it was "clear beyond reasonable dispute that [Echostar] ha[d] been guilty of gross spoliation of evidence." Consequently, at trial, the court imposed certain limits on Echostar's ability to present evidence that plaintiff's termination of employment was based on a "corporate reorganization" and that plaintiff's termination was for a "legitimate non-discriminatory/non-retaliatory reason," and specifically, the court granted Broccoli's request for an "adverse inference" instruction based on spoliation of evidence.  The court deferred a full explication of its ruling until after trial, as well as any determination as to Broccoli's request for fees and costs for Echostar's discovery violations.

B.

---

[2]Echostar failed to preserve: (1) employment-related documents relevant to Broccoli and his termination in November 2001; (2) corporate records relating to the alleged dissolution of the "regional teams" that, according to Echostar, resulted in Broccoli's termination as part of a bona fide reduction in force; (3) correspondence by corporate decision makers pertaining to Broccoli's termination; and (4) emails and other electronic communications exchanged during Broccoli's employment and termination.  This failure to preserve documents occurred despite Broccoli's written complaint, submitted to Echostar at the time of his termination, that he was unfairly treated by the human resources department. Indisputably, Echostar should have reasonably anticipated that litigation would follow Broccoli's termination and it should have preserved all relevant documents.

A party has a duty to preserve evidence when the party is placed on notice that the evidence is relevant to litigation or when the party should have known that the evidence may be relevant to future litigation. *Silvestri v. General Motors* Corp., 271 F.3d 583, 591 (4th Cir. 2001); *Thompson v. HUD*, 219 F.R.D. 93, 100 (D.Md. 2003). The duty to preserve encompasses any documents or tangible items authored or made by individuals likely to have discoverable information that the disclosing party may use to support its claims or defenses. *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217-18 (S.D.N.Y. 2003). Any information relevant to the claims or defenses of any party, or which is relevant to the subject matter involved in the litigation, is covered by the duty to preserve. *Id*.

"'Document retention policies', which are created in part to keep certain information from getting into the hands of others . . . are common in business." *Arthur Anderson, LLP v. United States*, 544 U.S. ___ (No. 04-368, slip op. at 7, May 31, 2005). It is not wrongful for a manager or company to instruct its employees to comply with a valid document retention policy under normal circumstances. *Id*. at 7-8. However, "[o]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Thompson*, 219 F.R.D. at 100 (quoting *Zubulake*, 220 F.R.D. at 218).

A failure to preserve documents and records, once the duty to do so has been triggered, raises the issue of spoliation of evidence. Spoliation refers to the destruction or material alteration of evidence or the failure to preserve the property for another's use as evidence in pending or reasonably foreseeable litigation. *Silvestri*, 271 F.3d at 590. A court

-4-

has discretion to impose sanctions for "the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct." *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995) (authorizing a court to permit a jury to draw adverse inferences from a party's failure to present evidence, the loss of evidence, or the destruction of evidence).   The court should, therefore, take into account the blameworthiness of the offending party and the prejudice suffered by the opposing party. *See Anderson v. National R.R. Passenger Corp.*, 866 F.Supp. 937, 945 (E.D. Va. 1994), *aff'd,* 74 F.3d 1230 (4th Cir. 1996).

C.

Under Echostar's extraordinary email/document retention policy, the email system automatically sends all items in a user's "sent items" folder over seven days old to the user's "deleted items" folder, and all items in a user's "deleted items" folder over 14 days old are then automatically purged from the user's "deleted items" folder.   The user's purged emails are not recorded or stored in any back up files.   Thus, when 21-day-old emails are purged, they are forever unretrievable.   The electronic files, including the contents of all folders, sub-folders, and all email folders, of former employees are also completely deleted 30 days after the employee leaves Echostar.   Again, under normal circumstances, such a policy may be a risky but arguably defensible business practice undeserving of sanctions.

However, the evidence in this case amply supports the finding that Echostar was placed on notice of potential litigation arising out of plaintiff's allegations of sexual harassment and retaliation as early as January 2001. Beginning in January 2001, Broccoli

informed two of his supervisors at Echostar, Chip Paulson and Larry Goldman (as each testified on deposition and at trial), both orally and via email, of Andersen's sexually harassing behavior. Paulson and Goldman testified that Broccoli made numerous complaints to them regarding Andersen's inappropriate behavior throughout 2001 and that they subsequently relayed, verbally and via email, the complaints to their superiors at Echostar. Moreover, Broccoli testified that he had an in-person meeting with Andersen's supervisor, Tammy Fornelius, the Regional Human Resources Manager, in July 2001, during which he specifically complained of Andersen's continued harassing behavior. Broccoli testified that Fornelius responded by advising him not to put his complaint in writing and allow her to take care of the matter informally.

Although Fornelius denied she ever had a communication with Broccoli regarding allegations of sexual harassment committed by Andersen, Fornelius's denials ring particularly hallow. On November 28, 2001, the day of his involuntary termination, Broccoli memorialized in writing his belief that his termination was due, in part, to his expressed complaints of Andersen's harassing behavior.[3]  Broccoli testified that he hand-delivered this complaint to Andersen shortly after he learned of his termination and Andersen admitted the truth of this testimony. She further testified that she forwarded Broccoli's complaint to her

---

[3]Broccoli's November 28, 2001, complaint stated: "I believe this is unfair treatment with several positions available for me in the North East Region, to release me without offering me one of these open positions to stay with this company is truly poor judgment and mistreatment by Upper Management.  I really believe that this also has to do with Echostar owing me over $6,000.00 in incentives not paid to me and the Disrespect [sic] shown to me by Echostar's Human Resource Dept. over the last 11 months."  *Pl. Tr. Exh. 121.*

supervisors in upper management. *However, no one in upper management recalls ever having seen this complaint prior to this litigation*. In short, the evidence of a regular policy at Echostar of "deep-sixing" nettlesome documents and records (and of management's efforts to avoid their creation in the first instance) is overwhelming.[4]

Finally, Broccoli's girlfriend, Dr. Grace Kim, sent a letter on December 20, 2001, via email, to executives at Echostar alleging that Broccoli's termination was the product of discriminatory conduct by Andersen. In February 2002, Broccoli filed an employment discrimination complaint with the Equal Employment Opportunity Commission ("EEOC"), after which the EEOC conducted an investigation.

Echostar claims that it had no knowledge of Broccoli's complaints until it received Dr. Kim's letter dated December 20, 2001, and thus was under no obligation prior to that date to preserve documents in a manner contrary to their normal document retention policy. This line of defense fails. First, there is ample evidence to support the finding that Broccoli informed Echostar, via verbal and email communications with his direct supervisors Paulson and Goldman, of Andersen's potentially illegal behavior as early as January 2001. Therefore, Echostar was on actual notice at that time of the need to preserve all documentation relevant

---

[4]    "The use of the phrase 'deep-six' does not suggest a lawful or benign explanation for the Commission's action. That phrase has been a part of naval parlance as a synonym for burial at sea for a very long time. It moved landward and acquired more general notoriety when it became part of the Watergate folklore after it was revealed that John Ehrlichman had suggested to John Dean that he 'deep-six' a number of sensitive documents to keep them from investigators."

*American Ass'n of Retired Persons v. E.E.O.C.*, 655 F.Supp. 228, 234 n.15 (D.D.C. 1987), *rev'd*, 823 F.2d 600 (D.C.Cir. 1987).

to Broccoli's complaints, including emails and personnel files. *See Zubulake*, 220 F.R.D. at 217 (identifying the document preservation trigger date when plaintiff's grievances were communicated to her supervisors). Defendants were greatly aided in their impeachment of Broccoli's former supervisors, and Broccoli thereby suffered palpable prejudice, owing to the absence of any kind of "paper trail" covering Broccoli's interactions with his supervisors and co-workers.

Moreover, Echostar plainly had a duty to preserve employment and termination documents when its management learned of Broccoli's potential Title VII claim that could result in litigation.  Yet, the discovery process revealed that Broccoli's personnel file did not even include his performance evaluations, which his supervisors, Paulson and Goldman, testified they had conducted and documented. Nor did Echostar produce  any substantial documentation of the alleged regional team dissolution that it asserted resulted in Broccoli's termination. And, Echostar failed to produce Fornelius' investigative file containing her notes from her meeting and conversations with Broccoli and his managers.

In short, none of the emails exchanged between Broccoli, Broccoli's supervisors, and Echostar's upper management regarding his complaints against Andersen were preserved. Moreover, Echostar admits that it never issued a company-wide instruction regarding the suspension of any data destruction policy even after Broccoli's November 2001 disputed termination and Dr. Kim's accusatory letter received in December 2001.  Echostar did not even bother to save Broccoli's emails of the 30 days prior to his termination upon receiving Broccoli's November 28, 2001, written complaint and Dr. Kim's December 20, 2001, letter.

Given Echostar's status as a large public corporation with ample financial resources and personnel management know-how, the court finds it indefensible that such basic personnel procedures and related documentation were lacking. Even more than before trial, it is now "clear beyond reasonable dispute that [Echostar] ha[d] been guilty of gross spoliation of evidence." Echostar clearly acted in bad faith in its failure to suspend its email and data destruction policy or preserve essential personnel documents in order to fulfill its duty to preserve the relevant documentation for purposes of potential litigation. These bad faith actions prejudiced Broccoli in his attempts to litigate his claims and measurably increased the costs for him to do so.[5]

For the reasons set forth above, the court granted Broccoli's motion for sanctions and included an adverse spoliation of evidence instruction in the jury instructions.

D.

If a party fails to make disclosures as required by Rule 26(a), Rule 37 permits a party to file a motion for sanctions. Fed.R.Civ.P. 37(a)(2).  If the motion for sanctions is granted, the court may require the non-moving party to pay the moving party's reasonable costs and attorney's fees incurred in making the motion.  Fed.R.Civ.P. 37(a)(4)(A).  Appendix B of the Local Rules of the United States District Court for the District of Maryland provides guidelines for determining reasonable attorney's fees in civil rights and discrimination cases.

---

[5]For example, Broccoli did not have access to any inappropriate emails allegedly sent by Andersen, Goldman's emails to his superiors relaying Broccoli's complaints, Goldman's negative evaluation of Andersen, copies of human resources reports, agendas, and notes concerning harassment policies, and any documents relating to the alleged regional restructuring.

LOCAL RULES FOR U.S. DISTRICT OF MARYLAND, APPENDIX B.  (identifying the lodestar method as the appropriate means of calculating attorney's fees); *see Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (identifying the lodestar method as the appropriate method of calculating attorney's fees in civil rights fee-shifting cases).  The lodestar method is the appropriate starting point for a court's initial estimate of reasonable attorneys fees, whether pursuant to fee-shifting statutes or Rule 37 sanctions. *See Blanchard v. Bergeron*, 489 U.S. 87, 94 (1989) ("the initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate") (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)); Fed.R.Civ.P. 37(A)(4)(A) ("the court shall . . . require the [non-moving] party . . . to pay to the moving party the *reasonable* expenses incurred in making the motion, including attorney's fees") (emphasis added).

Based on the court's findings on the merits of the motion for sanctions and in accordance with Rule 37, the court shall grant Broccoli's motion for reasonable costs and attorneys' fees. Broccoli has requested $26,109.50, based on a total of 123.6 hours completed by Carla Bailey, Esq. (a mid-level associate), Jerald Oppel, Esq. (a senior partner), and two paralegals.

The court finds the requested amount to be excessive. First, the hourly rates exceed the local guidelines. Therefore, Bailey's hourly rate shall be reduced from the proposed $195

per hour to $170 per hour for a lawyer admitted to the bar for less than five years.[6]  Oppel's

hourly rates shall be reduced from the proposed $320 per hour to $275 per hour for a lawyer

admitted to the bar for more than eight years. The paralegals' hourly rates shall be reduced

from the proposed $100 and $115 per hour to $90 per hour.

The court also finds the total number of 123.6 hours to be excessive. Specifically,

Broccoli has requested compensation for client, third party, and intra-office meetings for

both Bailey and Oppel.  The guidelines limit compensation for such activities to only one

lawyer and in the case of intra-office conferences, the time may be charged at the rate of the

more senior lawyer. LOCAL RULES FOR U.S. DISTRICT OF MARYLAND, APPENDIX B(2).

Accordingly, the court shall decrease Bailey's proposed hours by 14 hours and paralegal

Banister's hours by 1.7 hours. The court also finds the hours of work incurred by Bailey for

some tasks to be unreasonably excessive given the nature of the tasks.[7] Therefore, a further

decrease in Bailey's proposed hours (i.e., by 23.7 hours) is appropriate. After modifying the

hourly rates and hours expended to reflect the appropriate hourly rates for what the court

deems to be reasonable hours expended, the court shall award Broccoli $16,097 as a

reasonable sanction for a total of 84.2 hours of time incurred by plaintiff in counsels'

reasonable efforts to overcome the effects of Echostar's discovery violations and spoliation

---

[6]Broccoli's motion did not specify Bailey's years of experience and vaguely identified her as a mid-level associate.

[7]For example, Bailey's time charged for drafting and editing the motion for sanctions totaled more than 33 hours, which the court finds to be unreasonably high.

of evidence. The court's award is based on 21.4 hour for Oppel, 57 hours for Bailey, and 5.8 hours for paralegals (Fowler, 4.5 hours; Bannister, 1.3 hours).

## II.

### A.

As previously mentioned, on March 30, 2005, judgment was entered in favor of Broccoli on his breach of contract and wage payment claims in the amount of $9668.64, which constituted a trebling of actual damages based on the jury's finding that Echostar's withholding of Broccoli's wages was not a result of a *bona fide* dispute. The Maryland Wage Payments and Collection Act authorizes the court to exercise its discretion in awarding reasonable attorney's fees and costs under such circumstances.  The act states, in pertinent part: "If, in an action under [the Act], a court finds that an employer withheld the wage of an employee in violation of [the Act] and not as a result of a *bona fide* dispute, the court may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs."  MD. COD. ANN., LAB. & EMPL. § 3-507.1(b).  Moreover, the Maryland Legislature intended that courts should apply their discretion liberally in favor of awarding fees. *Friolo v. Frankel*, 373 Md. 501, 515 (2003). Accordingly, the court shall grant Broccoli an award of reasonable attorney's fees; plaintiff did not seek costs.

### B.

Determining the number of reasonable hours and the reasonable hourly rate for an award of attorney's fees under state law is guided by the lodestar approach and Rule 1.5 of the Maryland Rules of Professional Conduct. *Friolo*, 373 Md. at 504-05, 519. The Maryland

Rules of Professional Conduct offers a list of factors to be considered in determining the reasonableness of a fee including, but not limited to: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; and (2) the fee customarily charged in the locality for similar legal services. MD. RULES PROF. COND. RULE 1.5 (2005).

Broccoli has requested $30,957 in attorney's fees arising out of the litigation for his wage payment claim. Broccoli's request is based on 47.6 hours of work by Oppel, at the rate of $275 per hour, and 105.1 hours of work by Bailey, at the rate of $170 per hour. The court accepts the hourly rates for the respective attorneys as reasonable hourly rates for a claim of this nature.[8]  However, the court finds the number of hours expended on some tasks to be excessive. For example, there were numerous instances in which both lawyers participated in a conference call or meeting with a client and each billed time for the task. The court will limit the award to the time expended by the more senior counsel, i.e., Oppel, in joint tasks. Moreover, the court finds that counsels' hours for some tasks are unreasonably high given the nature of the tasks.

After carefully reviewing the billing chart submitted by plaintiff, the court finds that a reasonable  award of $21,212.50 is warranted: 68 hours of work by Bailey at the rate of $170 per hour and 35.1 hours of work by Oppel at the rate of $275 per hour.

---

[8]Broccoli based his hourly rates on Appendix B of the Rules of the U.S. District Court for the District of Maryland.  Notably, these rates are a guide for federal claims, and thus are not as strictly applicable to state law claims litigated in federal court.  Nonetheless, the suggested rates may be referred to as a guide for determining reasonable hourly rates for state law claims.

III.

A.

Federal Rule 54(d)(1) provides: "Except when express provision therefor is made either in a statute of the United States or in these rules, costs other than attorney's fees shall be allowed as a matter of course to the prevailing party unless the court otherwise directs." "The rule is generally thought a vestige of the English 'loser pays' rule . . . insofar as the main objection to the English rule is that calculating a reasonable attorney's fee is difficult and cumbersome, it falls away when the calculation is limited to the items taxable as costs." *Anderson v. Griffin*, 397 F.3d 515, 522 (7th Cir. 2005).

A prerequisite for an award of costs is a determination by the court that the moving party is a prevailing party. Much of the case law articulating the applicable legal standards for a determination of prevailing party status concerns civil rights fee-shifting statutes as they apply to attorney's fees. *See, e.g.*, *Hensley*, 461 U.S. at 433 (requiring that a party succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit in order to be awarded attorneys fees as a civil rights prevailing party); *Farrar v. Hobby*, 506 U.S. 103, 109-12 (1992) (concluding that an award of nominal damages confers prevailing party status on the plaintiff, and in order to receive attorney's fees the plaintiff (1) must obtain at least some relief on the merits of his claim, and thus obtain an enforceable judgment against the defendant from whom fees are sought and (2) "the actual relief on the merits of his claim materially alters the legal relationship between the parties modifying the defendant's behavior in a way that directly benefits the plaintiff");

-14-

*Farrar*, 506 U.S. at 121 (O'Connor, J., concurring) (identifying the indicia of success as: (1) the extent of relief obtained in comparison to the relief sought; (2) the significance of the legal issue on which the plaintiff prevailed; and (3) the public purpose served by the plaintiff's successful claims); *Mercer v. Duke University*, 401 F.3d 199, 203 (4th Cir. 2005) (concluding that the award of nominal damages suffices to make the plaintiff a prevailing party within the meaning of section 1988(b) so long as the actual relief on the merits materially alters the legal relationship between the parties to the direct benefit of the plaintiff) (citing *Farrar*, 506 U.S. at 111-12).

To be deemed a prevailing party, a plaintiff must prevail on "any significant claim affording some of the relief sought." *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 791 (1989) (rejecting the law in some circuits that plaintiff must prevail on the "central issue" and achieve the "primary relief sought").  Moreover, the relief cannot be merely declaratory or procedural, but must reach the underlying merits of the claim and "affect[] the behavior of the defendants towards the plaintiff." *Hewitt v. Helms*, 482 U.S. 755, 761 (1987).

In their Rule 54(d) analyses, courts approach the determination of prevailing party status using the same legal standards used for purposes of awarding attorney's fees in civil rights fee-shifting statutes. *Tunison v. Continental Airlines Corp.*, 162 F.3d 1187, 1189-90 (D.C. Cir. 1998) (concluding that the prevailing party determination is generally the same for purposes of attorneys' fees or costs by pointing out that attorneys' fees under § 1988 are awarded "as part of the costs," and thus suggesting that the prevailing party standard for §

-15-

1988 and 54(d) are the same) (citing *Farrar v. Hobby*, 506 U.S. 103, 119 (1992) (O'Connor,

J., concurring)); *see also Manildra Milling Corp. v. Ogilvie Mills, Inc.*, 76 F.3d 1178, 1180

n.1 (Fed. Cir. 1996) ("[T]he meaning of prevailing party is the same in either context.");

*Studiengesellschaft Kohle mbH v. Eastman Kodak Co.*, 713 F.2d 128, 132 (5th Cir. 1983) (§

1988 case has applicability in a Rule 54(d) case because both require a determination of who

is the prevailing party); *Johnson v. City of Aiken*, 278 F.3d 333, 339 (4th Cir. 2002)

("Because the § 1988 award included reimbursements for costs taxable under 28 U.S.C.A.

§ 1920 and Federal Rule of Civil Procedure 54(d)," the determination that appellees were

the prevailing party for purposes of § 1988 also applied for purposes of Rule 54(d)).

The above cases discuss the issue of prevailing party status in the context of a plaintiff

seeking attorney's fees and costs pursuant to 42 U.S.C. § 1988 and/or Rule 54(d) after

having been awarded only nominal damages, as opposed to a larger requested pecuniary

award, or having succeeded on some of the federal claims, as opposed to all of them.  In

contrast, the instant case involves the defendant seeking costs based on the jury's finding in

favor of Echostar on the Title VII sexual harassment and retaliation claims as well as the

tortious interference with prospective advantage claim.[9] The plaintiff succeeded only on his

state law wage claim and common law breach of contract claim.

B.

---

[9]On April 13, 2005, Echostar timely filed a bill of costs in the amount of $16,104.40
pursuant to Rule 54(d)(1).  The bill of costs consisted of $12,056.40  incurred for depositions of
eleven witnesses and $4,048 incurred for trial exhibits.

-16-

Facially, it appears that Echostar succeeded on all of the federal claims and three out of the five claims submitted to the jury. To the contrary, however, when the jury's verdict is analyzed in depth, based partly on the completed verdict form, the verdict is facially inconsistent with respect to the Title VII retaliation claim and the tortious interference with economic advantage claim. In any event, for the reasons stated below, the court concludes that Echostar is not in fact a prevailing party.

On the one hand, the jury found that none of the elements for a Title VII sexual harassment or retaliation claim were met. On the other hand, the jury found that defendant Andersen[10] "improperly, intentionally, and willfully interfered with Mr. Broccoli's prospective economic advantage with Dr. Grace Kim by giving false and detrimental employment references[,] [t]hat defendants' acts were calculated to cause damage to the prospective advantage of Mr. Broccoli[, and] [t]hat defendants acted with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of defendants." *See* Verdict Form, Doc. 96 at 6; *see Robinson v. Shell*, 519 U.S. 337 (1997) (defining "employees" as used in § 704(a) of Title VII to include former employees for purposes of alleged retaliatory post-employment actions). However, because the jury did not find any actual injury to Broccoli as a result of Andersen's false negative employment reference, it returned a verdict in favor of Echostar and Andersen on the tortious interference

---

[10]For purposes of this case, there is no dispute that Echostar was Andersen's principal and that all of the acts and omissions of Andersen are attributable to Echostar. They were represented by the same counsel and are in absolute privity.

claim.[11]  Consequently, Broccoli prevailed *in substance* on the tortious interference claim despite the facially unfavorable jury verdict.

Such a finding on the tortious interference claim clearly contradicts the results on the Title VII retaliation claim. Broccoli testified at trial that he complained to Andersen's supervisor, Tammy Fornelius, in the summer of 2001 of Andersen's alleged sexual harassment. Broccoli was terminated in late November 2001. The record shows that Echostar and Andersen were put on notice as early as December 2001 of potential litigation ensuing from Broccoli's sexual harassment and retaliation complaints. *See Pl. Exhs. 127, 128* (Dr. Kim's December 20, 2001 letter to Echostar's upper management describing Broccoli's basis for believing he was sexually harassed and retaliated against by Stacie Andersen).

Dr. Kim testified that several months after Broccoli's termination in November 2001, i.e., in May 2002, she telephoned Echostar to obtain an employment reference as to Broccoli, motivated in part by Broccoli's continued inability to obtain new employment. She was referred to and spoke to Andersen, who orally gave her a negative false employment reference. The jury credited Dr. Kim's testimony in this regard and rejected Andersen's denials that such a conversation ever occurred. The only rational explanation of the jury's finding is that this evidence is probative of both Andersen's tortious and retaliatory animus. Defendants did not provide any evidence at trial supporting an alternative explanation for the animus held by Andersen towards Broccoli and its manifestation through the negative

---

[11]Broccoli did not request an instruction on nominal damages in connection to the tortious interference claim, thus a finding of nominal damages was not a verdict available to the jury.

employment reference. (Andersen's negative employment reference also occurred subsequent to the commencement of the EEOC investigation into Broccoli's complaints; accordingly, Andersen had a stronger motive to retaliate against Broccoli than she did at the time Broccoli was terminated.)  Based on these facts, the court concludes that the jury's inconsistent verdict with respect to the retaliation and tortious interference claims was aberrational and very likely was a result of a jury compromise.

Consequently, the inconsistent verdict, combined with the inextricable nexus between the tortious interference and retaliation claims (e.g., the only motive supported by the evidence for Andersen's tortious interference is retaliation against Broccoli's for exercising his rights under Title VII) divests Echostar of the status of prevailing party for purposes of Rule 54(d). Thus, costs will not be awarded to Echostar.

The court is constrained to observe that, although it finds that the jury's verdict was a compromise for purposes of determining whether Echostar is a prevailing party under Rule 54, the jury's verdict was not so irrational or contrary to the weight of the evidence as to justify a new trial. Indeed, the court has previously denied Broccoli's motion for a new trial. Jury compromises are a common phenomena within our legal system that rarely provide a basis for ordering a new trial. *See United States v. Powell*, 469 U.S. 57 (1984) (upholding the validity of inconsistent verdicts in the criminal context); *City of Los Angeles v. Heller*, 475 U.S. 796, 805-06 (1986) (J. Stevens, dissenting) ("a court retains the authority, even in a civil case, to allow an apparently inconsistent verdict to stand").

C.

-19-

Even if the court were to find Echostar the prevailing party, which it does not, Broccoli is of sufficiently modest means to justify an exception to an award of costs pursuant to Rule 54(d).  The award of costs to the prevailing party is a matter firmly within the discretion of the trial court.  However, a court's departure from the normal practice of awarding costs must be accompanied by an articulated good reason for doing so.  *Oak Hall Cap and Gown Co., Inc. v. Old Dominion Freight Line, Inc.*, 899 F.2d 291, 296 (4th Cir. 1990); *see also Cherry v. Champion Int'l Corp.*, 186 F.3d 442, 446 (4th Cir. 1999).

The losing party's inability to pay will suffice to justify denying costs. *Cherry*, 186 F.3d at 446 (listing misconduct by the prevailing party worthy of penalty, the limited value of the prevailing party's victory, the closeness and difficulty of the issues decided, and the losing party's inability to pay as permissible justifications for a district court's denial of costs to the prevailing party).  Therefore, if the losing party is of such modest means that it would be unjust or inequitable to enforce Rule 54(d)(1) against him, then the court acts within its discretion to deny costs to the prevailing party.  *Id*. at 447. In order to benefit from this exception to Rule 54, however, the losing party must provide sufficient documentation establishing his inability to pay costs.  *Wyne v. Medo Industries, Inc.*, 329 F.Supp.2d 584, 588 (D.Md. 2004) (citing *Chapman v. Al Transp.*, 229 F.3d 1012, 1039 (11th Cir. 2000); *McGuigan v. CAE Link Corp.*, 155 F.R.D. 31, 35 (N.D.N.Y. 1994)).

Broccoli's opposition brief and exhibits provide adequate documentation to support his inability to pay Echostar's costs of $16,104.40.[12] Broccoli's total income in 2004 was $3627.07 earned from his current part time job at a department store that pays an hourly wage of $7.50. Prior to Broccoli's obtaining employment at Kohl's in the summer 2004, he was unemployed since his termination from Echostar in November 2001, with the exception of two jobs held for brief periods of time. Broccoli does not own or have an interest in any real property or any valuable personal property such as a motor vehicle, furniture, old coins, or jewelry. Broccoli does not own or have an interest in any bank or savings and loan accounts. Broccoli does not own or have an interest in any securities or any accounts with stockbrokers, stock brokerage firms, mutual fund companies, commodity brokers, or commodity brokerage firms. Therefore, Broccoli is clearly of sufficiently modest means to justify this court's denial of Echostar's bill of costs in the entirety.[13]

## IV.

On the basis of the findings and conclusions set forth above, Broccoli's motion for attorney's fees and costs in connection with his wage payment claim and his motion for

---

[12]Echostar has requested that the trustee in bankruptcy, who intervened, be liable for costs if Broccoli is found unable to pay. The request is denied. Echostar has not cited any law making a trustee liable for costs. Sklar has no interest in the case and was made a party at the insistence of Echostar.

[13]Broccoli, now acting pro se, has filed a notice of appeal and has sought a waiver of the filing fee for the appeal. The court is of the view that while Broccoli's impecuniousness exonerates him from responsibility for paying costs under Rule 54, he is plainly able to pay the filing fee for his appeal. Accordingly, his request to proceed on appeal in forma pauperis shall be denied.

-21-

sanctions are granted in part and denied in part, and his objection to Echostar's bill of

costs is sustained. Judgment shall be entered in favor of Broccoli for $21,212.50 for

attorneys fees associated with the wage payment claim and $16,097 for attorney's fees

associated with the motion for sanctions, or a total of $37,309.50. An Order follows.


Filed:  August 4, 2005                          _____/s/_____

                                                    Andre M. Davis
                                                    United States District Judge